Aaron Kaufmann, SBN 148580
akaufmann@kgworklaw.com
Elizabeth Gropman, SBN 294156
egropman@kgworklaw.com
KAUFMANN & GROPMAN, LLP
1939 Harrison Street, Suite 620
Oakland, CA 94612
Telephone: (510) 817-4380

*(Additional Counsel on Next Page)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROOSEVELT ESPINOSA; RUXNER ANDINO; EMEKA ANIAGBA; MAYCOL CAMEY; HANS DURAN; JOSE FERNANDEZ; CESAR GALINDO; ANTONIO HERMOSILLO; OTASOWIE ISIBOR; ISRAEL PONCE; SONIA ALVAREZ, successor in interest to and as substituted for RAFAEL ZAYAS; and MANUEL GUZMAN, <br><br> Plaintiffs, <br><br> v. <br><br> CEVA FREIGHT, LLC, a Delaware Company; and DOES 1-10, inclusive, <br><br> Defendants. | CASE NO. 2:23-CV-00659 ODW (Ex) <br><br> [Assigned to the Honorable Otis D. Wright II – Courtroom 5D] <br><br> **PLAINTIFFS ROOSEVELT ESPINOSA'S, JOSE FERNANDEZ'S, AND MANUEL GUZMAN'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO DEFENDANT CEVA FREIGHT, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT [FRCP 56]** <br><br> **Date:      July 14, 2025** <br> **Time:      1:30 pm** <br> **Before:   Hon. Otis D. Wright, II** <br> **Final PTC:   Sep. 22, 2025** <br> **Trial Date:   Oct. 14, 2025** |

James M. Finberg, SBN 114850
jfinberg@altshulerberzon.com
Eve H. Cervantez, SBN 164709
ecervantez@altshulerberzon.com
Amanda C. Lynch, SBN 318022
alynch@altshulerberzon.com
Jonah Lalas, SBN 286755
jlalas@altshulerberzon.com
Alice Xiaohe Wang
awang@altshulerberzon.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

Cornelia Ho-Chin Dai, SBN 207435
cdai@hadsellstormer.com
Sarah Cayer, SBN 334166
scayer@hadsellstormer.com
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Ave.
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079

*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................4

II.   PROCEDURAL BACKGROUND ..........................................5

III.  FACTUAL RECORD ...........................................................5

    A.  Nature of CEVA's Business ..........................................5

    B.  Plaintiffs' Tenure with CEVA ......................................6

    C.  CEVA's Ground Transportation Operations ...................7

    D.  CEVA's Relationship with Cargomatic............................9

IV.   ARGUMENT ...................................................................11

    A.  CEVA's Motion Must Be Denied on its Face .................11

    B.  CEVA Cannot Hide Behind Cargomatic to Avoid the ABC Test...................13

    C.  The Parties' FMCSA "Roles" Do Not Define CEVA's "Usual Course
of Business" for Purposes of Part B. ...............................14

    D.  CEVA Fails to Prove Part B Under the 3 *Vazquez* Inquiries............................16

        1.  Plaintiffs' Pickups and Deliveries Were Necessary, Not Incidental
to CEVA's Freight Transportation Business...................18

        2.  Plaintiffs Continuously Worked in CEVA's Freight
Transportation Business .................21

        3.  CEVA Holds Itself Out as a Freight Transportation Business......................22

V.    CONCLUSION..................................................................25

1

## TABLE OF AUTHORITIES

2

**Cases**

*Curry v. Equilon Enterprises, LLC*,
   23 Cal.App.5th 289 (2018) ........................................................................... 14

*Depianti v. Jan-Pro Franchising Int'l, Inc.*,
   990 N.E.2d 1054, 1068 (Mass. 2013) ........................................................ 13

*Dynamex Operations W. v. Superior Court*,
   4 Cal.5th 903 (2018) ............................................................................. 12, 15

*Espinoza v. Cnty. of San Bernardino*,
   2008 WL 11410021 (C.D. Cal. Dec. 19, 2008) ......................................... 12

*Gerber Dental Ctr. Corp. v. Me. Unemployment Ins. Comm'n*,
   531 A.2 1262 (Me. 1987) ............................................................................ 24

*Goro v. Flowers Foods, Inc.*,
   2021 WL 4295294 (S.D. Cal. Sept. 21, 2021) ............................... 13, 20, 23

*Guynn-Neupane v. Magna Legal Services, LLC*,
   Case No. 19-cv-02652-VKD, 2021 WL 4481661 (N.D. Cal. Sept. 30, 2021) ......... 20

*Henderson v. Equilon Enters., LLC*,
   40 Cal.App.5th 1111 (2019) ........................................................................ 14

*Herrera v. Flowers Baking Co. of Modesto, LLC*,
   2024 WL 2722861 (May 28, 2024 E.D. Cal.) ............................................ 20

*Ludlow v. Flowers*,
   2022 WL 2441295 (S.D. Cal. Jul. 5, 2022) ................................................ 13

*Martinez v. Combs*,
   49 Cal. 4th 35 (2010) .................................................................................. 15

*Mejia v. Roussos Construction, Inc.*,
   76 Cal.App.5th 811 (2022) .......................................................................... 13

*Moreno v. JCT Logistics, Inc.*,
   2019 WL 3858999 (C.D. Cal. May 29, 2019 ............................................. 13

*People v. Uber Technologies, Inc.*,
   56 Cal.App.5th 266 (2020) .................................................................... 13, 20

*Pinkerton's, Inc. v. Superior Court*,
   49 Cal.App.4th 1342 (1996) .......................................................................... 7

*Roman v. Jan-Pro Franchising International, Inc.*,
   342 F.R.D. 274 (N.D. Cal. 2022) .......................................................... 13, 24

*S. G. Borello & Sons, Inc., v Dep't of Indus. Rels.*,
   48 Cal.3d 341 (1989) .................................................................................. 20

*Sportsman v. A Place for Rover, Inc.*,
   537 F.Supp.3d 1081 (N.D. Cal. 2021) .................................................. 12, 21

*Vazquez v. Jan-Pro Franchising Int'l, Inc.*,
   986 F.3d 1106 (9th Cir. 2021) ............................................................. *passim*

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Cases (cont'd)**

*Williams v. Dumaguindin,*
   No. 22-cv-9042, 2022 WL 16571165 (C.D. Cal. Oct. 24, 2022) .............................. 12

**Statutes**
29 U.S.C.
   § 207 ...................................................................................................... 5
Cal. Labor Code
   § 2775 .................................................................................... 4, 5, 11, 12

**Other Authorities**
 I.W.C. Wage Order
   No. 9 ...................................................................................................... 5

PLAINTIFFS' MPA OPPOSING DEFENDANT CEVA'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:23-CV-00659 ODW (Ex)

## I.    __INTRODUCTION__

Bellwether Plaintiffs, Roosevelt Espinosa, Jose Fernandez, and Manual Guzman ("Plaintiffs") picked up and delivered Defendant CEVA Freight, LLC's ("CEVA") customers' freight to and from CEVA's warehouses, under CEVA's direction, for many years. At first, CEVA contracted with Plaintiffs and other drivers directly. But after being sued many times for misclassifying drivers as "independent contractors," CEVA outsourced the mechanism for misclassifying its drivers: CEVA told the drivers that to continue transporting CEVA freight they had to contract through a third-party, Cargomatic, Inc. Plaintiffs did so, entering contracts that again classified them as independent contractors, and then carried on doing much of the same CEVA work, from the same CEVA locations, that they had before.

California law states that "a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all three" parts of the "ABC" test are satisfied: (A) the person is free from the control and direction of the hiring entity; (B) the person performs work that is outside the usual course of the hiring entity's business; *and* (C) the person is customarily engaged in an independently established business. Cal. Labor Code § 2775(b). Here, CEVA cannot obtain judgment on its defense; it has moved *only* on Part B when it must prove all three parts, and it cannot even satisfy Part B.

CEVA's attempts to dodge proving Part B at all, arguing that only Cargomatic is subject to the ABC test because it contracted with Plaintiffs, and that CEVA's self-designated role as a "shipper" under the Federal Motor Carrier Safety Administration ("FMCSA") regulations changes the Part B analysis to a "narrow" one. Courts have rejected the former argument, and CEVA offers no legal or factual support for the latter.

Finally, CEVA fails to prove Part B under the three pertinent inquiries, as the facts show that: (1) Plaintiffs' pickup and delivery services were necessary to CEVA's usual course of business; (2) CEVA continuously relies on Plaintiffs and other drivers

to provide those services; and (3) CEVA holds itself out as being in the freight

transportation business, including providing the ground transportation services

provided by Plaintiffs. CEVA therefore fails to satisfy that portion of the ABC test.

Plaintiffs' simultaneous motion for partial summary judgment shows CEVA *cannot*

prove Part B as a matter of law.

## II.     PROCEDURAL BACKGROUND

The Sixth Amended Complaint, Dkt-103, avers California and Los Angeles law

claims, as well as a federal overtime claim under the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 207. The state law claims, other than for sick pay, allege

violations of California's Labor Code and Industrial Welfare Commission ("IWC")

wage order No. 9 (hereafter "wage order"). *See* Dkt-103, ¶¶ 54, 58, 72, 74, 94, 111-

113, 123. CEVA avers in its Third Affirmative Defense that: "Any recovery on

Plaintiffs' pleading is barred because Plaintiffs were at all times independent

contractors and not subject to the provisions of the California Labor Code, the

applicable wage orders of the California Industrial Welfare Commission, and/or any

other law alleged in their pleading." Dkt-105, 21:17-20.

Plaintiffs moves for partial summary judgment on the basis that CEVA cannot

prove Part B of the ABC test as a matter of law, and they are therefore entitled to

partial summary judgment on CEVA's independent contractor defense as it applies to

the state and local law claims. Dkt-112, 3:6-16.

CEVA's motion contends "there is no triable issue of material fact as that

Defendant satisfies Part B of the ABC test, pursuant to California Labor Code §

2775(b)(1). As such, Defendant is entitled to judgment as a matter of law." Dkt-116,

3:10-12.

## III.    FACTUAL RECORD

### A.    Nature of CEVA's Business

CEVA acknowledges that it is part of a "global logistics network" of "sister

companies" marketed as "CEVA Logistics." Dkt-116-1, 9:13-14. CEVA admits that

the CEVA Logistics website advertises that it provides "end-to-end logistics solutions,"
including, "warehousing and 'final mile' fulfillment services for goods that are moving
through CEVA Logistics' system." *Id.*, 9:21-26; *see also* AMF-81-88 (CEVA provides
ground transportation, including pickup and delivery services). CEVA Logistics'
website further describes the ground transportation business as offering: "Pick-up and
delivery services"; "Part-load services" and "Transportation Brokerage/Intermodal"
using its "own equipment and external capacity"; "Dedicated transportation solutions"
that includes "Milk-run collection and delivery"; and "Premium Services" including
"white glove home delivery" and "high value and sensitive cargo transportation."
AMF-85. The website details the network's "[s]pecial capabilities" to provide
transportation services include "+1,000 trained and uniformed drivers and a fleet [of]
air-ride trailers" and its "[o]wn trucks or third party vehicles adapted to each
commodity and compliant to regulation standards." AMF-86. The website states: "**Our
vast ground network and strategic hubs:** provide reliable and efficient delivery
services to our customers. **Seamless connection to major U.S. airports** with domestic
air freight services." AMF-87. CEVA admits that Defendant CEVA Freight is
"responsib[le] for warehousing and 'final mile' fulfillment services for goods that are
moving through CEVA Logistics' system." Dkt-116-1, 9:24-26.

CEVA runs its ground transportation services with three types of drivers: drivers
it acknowledges to be its employees ("Company Drivers," of which there are currently
16 in California), drivers with whom CEVA directly contracts ("Direct Contract
Drivers"), and drivers like Plaintiffs who provide services to CEVA but directly
contract with Cargomatic ("Drivers"). AMF-91-94.

## B.    Plaintiffs' Tenure with CEVA

Plaintiffs transported freight for CEVA's customers for many years. SUF-24, 40;
AMF-95. They initially contracted directly with CEVA's predecessor, EGL, using form
"independent contractor" services agreements. AMF-95. Then, in 2017, "CEVA ceased
providing trucking services in California directly using independent owner-operators"

PLAINTIFFS' MPA OPPOSING DEFENDANT CEVA'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:23-CV-00659 ODW (Ex)

and instead "contracted with Cargomatic to arrange for any trucking services."[1] Dkt-116-1, 12:14-16 (citing SUF-42-43). Under its Terms of Service Agreement with CEVA ("TSA"), Cargomatic committed to including provisions in its "carrier" contracts that evidenced an independent contractor relationship with the "carrier," AMF-98.

CEVA admits it informed the drivers that if they "intended to provide trucking services to CEVA," they needed to contract with Cargomatic. Dkt-116-1, 12:15-26. Most of the Drivers that signed up with Cargomatic had previously contracted with CEVA. AMF-97.

Plaintiffs entered Cargomatic's Terms of Service ("TOS") using their personal names. RSP-SUF-49; AMF-100. While CEVA asserts "Plaintiffs all formed a registered business entity in California," SUF-41, each Plaintiff only registered a fictitious business name (aka "DBA").[2] AMF-104. The TOS classified Plaintiffs as "independent contractors," AMF-98.

Plaintiffs continued transporting CEVA freight under the TOS, *see* SUF-49, serving largely the same pickup and delivery routes and "hot shot" runs in the same geographic areas that they worked when they contracted directly with CEVA. AMF-105. Plaintiffs typically worked full-time transporting CEVA freight. AMF-106-108.

### C.    CEVA's Ground Transportation Operations

CEVA operates five ground facilities in California, including Ontario and Los Angeles, where Plaintiffs worked. SUF-23, 24. Between Ontario and Los Angeles, there are approximately 65 Drivers, 5 Company Drivers, and 4 Direct Contract Drivers, and all three groups perform pickups and deliveries. AMF-114. While CEVA claims that ground operations constitute "only a small portion of the overall services which

---

[1] This is not entirely true, as CEVA admits to still using Direct Contract Drivers. RSP-SUF-42; AMF 91.

[2] A DBA is not a legal entity. *Pinkerton's, Inc. v. Superior Court,* 49 Cal.App.4th 1342, 1348 (1996).

1    CEVA *Logistics* offers to the public,"[3] Dkt-161-1, 10:4-6 (emphasis added), Defendant

2    CEVA *Freight* relies on the Drivers to service approximately 90 percent of its freight

3    movements, AMF-95, amounting to 400 to 500 shipments daily. AMF-159. CEVA's

4    operations include picking up from and delivering to business and residential customers

5    and shuttling air freight, including "high value" movements, "white glove" deliveries,

6    transporting pallets and trailers to business customers, and "picking and packing"

7    orders. AMF-109-13.

8        CEVA staffs its warehouses with operations managers, ground supervisors,

9    warehouse supervisors, dispatchers, supply chains operation specialists, rating and

10    billing clerks, and operations key account managers. AMF-131. CEVA employs

11    approximately 52 people to support its ground operations in its LA and Ontario

12    facilities. AMF-132. Cargomatic dispatchers work inside CEVA's warehouses,

13    regularly communicating with the Drivers and CEVA staff. AMF-135, 136, 145, 163.

14    CEVA's dock staff plan, pull, and stage the freight for the Drivers. AMF-147-50.

15    CEVA also provides Drivers with certain equipment, including trailers. AMF-127-30.

16        CEVA schedules its customers' orders and sends for dispatching to the drivers.

17    AMF-133-36. CEVA provides the documentation for the Drivers' assignments,

18    including specific instructions about pickups and deliveries (e.g., white-glove

19    deliveries, extra security measures), which dispatchers relay to the Drivers. AMF-134.

20    CEVA relies on Drivers *and* Company Drivers to handle shipments, often documenting

21    assignments to both groups on the same listings. AMF-135. There is little if any

22    differentiation in the kinds of shipments assigned to the three driver groups—Drivers,

23    Company Drivers, and Direct Contract Drivers—as most work is assigned based on

24    availability and vehicle type needed. AMF-115, 119, 123, 142.

25

26

27    _____

[3] CEVA has offered no detailed evidence from which Plaintiffs or the Court can test the accuracy of
this conclusory characterization, as it offers no financial information about CEVA Logistics or CEVA

28    Freight. RSP-SUF-115.

PLAINTIFFS' MPA OPPOSING DEFENDANT CEVA'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:23-CV-00659 ODW (Ex)

1    Plaintiffs had little choice in their assignments, and they did not typically use the

2    Cargomatic mobile application to choose shipments. AMF-138. Instead, the

3    assignments were sent to Plaintiffs the night before or handed to them when they

4    arrived at CEVA's warehouse in the morning. AMF-139. Rarely did they decline

5    CEVA shipments or perform shipments for other Cargomatic customers. AMF-140.

6    CEVA's claim it only had "limited" communications with the Drivers is not

7    accurate. RSP-SUF-26. Many of the CEVA staff had regular contact with the Plaintiffs

8    and other Drivers. AMF-137, 146. For instance, Plaintiffs regularly communicated

9    directly with CEVA dispatchers and other staff regarding their assignments when

10   Cargomatic dispatchers were not available, to receive additional assignments while in

11   the field, or if customer service issues arose. AMF-137. CEVA's warehouse

12   supervisors also interact with Drivers regularly. AMF-151. To leave the warehouse,

13   Plaintiffs gave CEVA staff paperwork documenting the freight loaded on their

14   vehicles. AMF-152.

15   While Cargomatic sets the trip pay rates for the Drivers, the rates were pegged to

16   the amount CEVA agreed to pay Cargomatic. AMF-167. Plaintiff Fernandez spoke

17   directly with a CEVA manager when seeking a higher trip rate. AMF-182.

18   **D.    CEVA's Relationship with Cargomatic**

19   CEVA enlisted Cargomatic to serve as an intermediary with CEVA's drivers in

20   2017. SUF-16. While CEVA insists that "[i]n its relationship with Cargomatic, CEVA

21   exclusively functions as a shipper" under the FMCSA, Dkt-116-1, 10:8-9, nothing in

22   the TSA between those parties identifies CEVA as a "shipper." RSP-SUF-17, 19.

23   CEVA also testified that, under the TSA, CEVA's customer is the "shipper." RSP-

24   SUF-17, 19; AMF-99, 166. Moreover, on the FMCSA website, CEVA has identified

25   itself as a "Carrier/Broker" with motor carrier and freight-forwarder authorities, not as

26   a "shipper." RSP-SUF-17; AMF-90.

27   CEVA sets the customers' rates, then invoices and collects payment from

28   customers for pickups and deliveries performed by Drivers and Company Drivers.

1  AMF-167, 168.

2      Cargomatic, through its mobile application and staff, dispatches and tracks the

3  Drivers' shipments for CEVA, SUF-34; AMF-154-58, 172, though CEVA also

4  continues to give Drivers work directly. AMF-137. Drivers use the Cargomatic app to

5  document the completion of shipments, which is then shared with CEVA. AMF-154.

6  Drivers' locations are tracked through the app's geolocation function and shared with

7  CEVA. AMF-155. Drivers record their work on CEVA-provided forms and upload

8  them into the app and deposit them with CEVA. SUF-27; AMF-156, 157. For

9  deliveries not requiring a receipt signature, CEVA instructs Drivers to document the

10  delivery with a photo uploaded into the app. AMF-158.

11      Cargomatic also ensures that Drivers move CEVA's freight in accordance with

12  CEVA's expectations. Cargomatic admitted that, under the TOS, "if CEVA gives

13  instructions regarding how to load, handle, or ship freight, [Drivers] are required to

14  comply with those instructions." RSP-SUF-64; AMF-101. It also admitted that CEVA

15  gives those instructions and, in turn, it shares them with the Drivers and holds them

16  accountable to follow. AMF-102, 178. CEVA sets safety expectations and rules and

17  regulations for Drivers working at CEVA's locations. AMF-177. Cargomatic trains the

18  Drivers on CEVA's service requirements and those of its customers. AMF-169-71;

19  SUF-53. CEVA relies on Cargomatic to take necessary steps to ensure Drivers comply

20  with its requirements. AMF-173.

21      CEVA's assertion that Plaintiffs "set their own hours" and "work schedules" is

22  not credible. RSP-SUF-60. CEVA determines when the Drivers can pick up freight at

23  the warehouse. AMF-174. CEVA and its customers determine the time windows for

24  pickups and deliveries. AMF-175. Cargomatic submits regular reports to CEVA

25  showing drivers' check-in and check-out times at CEVA's facilities and unsuccessful

26  delivery attempts. AMF-164. If a Driver cannot complete an assignment due to vehicle

27  failure, Cargomatic informs CEVA, and CEVA informs the customer. AMF-165.

28  CEVA requires the Drivers to return undeliverable freight to CEVA's facilities and

document the reason the delivery could not be completed. AMF-176.[4]

Cargomatic tracks and reports to CEVA the Drivers' performance on metrics established by CEVA, including on-time deliveries and pickups. AMF-172. Cargomatic ensures the Drivers meet "CEVA's key performance metrics and operational requirements." AMF-173. CEVA has instructed Cargomatic to stop assigning CEVA freight to Drivers who have had performance issues. AMF-180.

As part of managing the CEVA/Cargomatic relationship, CEVA and Cargomatic upper management hold quarterly meetings and otherwise communicate multiple times per week. AMF-160, 162. In addition to dispatchers, Cargomatic assigns managers and staff inside CEVA warehouses to support the Drivers' work. AMF-161. Cargomatic and CEVA managers meet regularly to ensure Drivers are "meeting CEVA's operational expectations and key performance indicators," including on-time pickups and deliveries. AMF-162. CEVA staff in its warehouses, including the Operations Manager, have daily interactions with Cargomatic dispatchers. AMF-163.

Finally, the TSA prohibited Cargomatic and Plaintiffs from performing freight transportation services for CEVA customers for 18-months post contract. AMF-181.

## IV.    <u>ARGUMENT</u>

### A.    **CEVA's Motion Must Be Denied on its Face**

CEVA's motion is fundamentally flawed. CEVA's motion is made "on the ground that there is no triable issue of material fact as that Defendant satisfies Part B of the ABC test, pursuant to California Labor Code § 2775(b)(1). As such, Defendant is entitled to judgment as a matter of law." Dkt-116, 3:9-12. CEVA's request for "judgment" is improper on its face, however, because it has not moved as to a complete

---

[4] CEVA's assertion that the Plaintiffs could hire helpers or other drivers and were free to "pay their drivers as helpers or employees" is immaterial to the Part B analysis under the ABC test. In any event, only Mr. Fernandez retained others to run routes, and he continued to personally service the same route he worked for CEVA for years. Fernandez Oppos Decl. ¶¶ 6-7. Contrary to CEVA's assertion that the Plaintiffs were free "to pay their drivers or helpers as employees or contractors," the TOS instructs the Drivers as to how to treat any hires as employees. Dkt-119-3, § 2.6.

defense to Plaintiffs' claims. California's three-part ABC test explicitly states that a worker is considered an employee rather than an independent contractor unless the defendant proves *all three* prongs of the test. Cal. Labor Code § 2775(b)(1); *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th Cir. 2021); *Dynamex Operations W. v. Superior Court*, 4 Cal.5th 903, 964 (2018). Therefore, even if CEVA could meet its burden on Part B (which it cannot), that would be insufficient to prove its affirmative defense and support a "judgment." Further, the ABC test is not the applicable test for employment status on Plaintiffs' federal overtime claim, which is governed by the FLSA under the multi-factor "economic realities" test. *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370-72 (9th Cir. 1981) (employing six-factor test). Thus, even assuming CEVA's assertion that it meets Part B (which it does not, as described below), it is not entitled to "judgment as a matter of law" on its independent contractor defense as to any of Plaintiffs claims.

    In addition to this insurmountable procedural flaw, many of CEVA's "facts" in its Statement of Undisputed Facts ("SUF"), Dkt-116-2, must be disregarded, as they are not facts but rather legal conclusions and arguments. *See Sportsman v. A Place for Rover, Inc.,* 537 F.Supp.3d 1081, 1088 (N.D. Cal. 2021) (disregarding "self-serving" and "conclusory" statements on summary judgment). Those include SUF-17, 21, 31, 64, 69, 72. Others are not supported by the evidence, whether admissible or not, and thus must be rejected. *See Williams v. Dumaguindin*, 2022 WL 16571165, at *4 (C.D. Cal. Oct. 24, 2022) ("To the extent that Barry's statements of undisputed facts are not supported by the evidence, the Court does not treat them as undisputed."); *Espinoza v. Cnty. of San Bernardino*, 2008 WL 11410021, *2 (C.D. Cal. Dec. 19, 2008) ("[T]he following 'Statements of Undisputed Fact' are either unsupported by the proffered evidence or are unintelligible, and [the Court] declines to find them 'undisputed'"). Those are SUF-17, 60, 61, 64, 66, 69, 71, 72. Others should similarly be disregarded because CEVA's supporting evidence is not admissible. *See* Plaintiffs' Objections to Evidence filed herewith; SUF-15, 17, 22, 31.

**B.    CEVA Cannot Hide Behind Cargomatic to Avoid the ABC Test.**

CEVA's gateway argument is: "Because Cargomatic is the only entity that had a contractual relationship with Plaintiffs, only Cargomatic could qualify as a 'hiring entity' under the ABC test." Dkt-116-1, 17:2-3. CEVA has not and cannot cite any authority to support this contention because it is contrary to established law.

The Ninth Circuit squarely rejected this argument in *Vazquez*, 986 F.3d at 1124. It explained:

> [T]he ABC test applies to a dispute between a putative employee and
> a hiring entity *even if they are not parties to the same contract*. As
> long as the putative employee was providing a service to the hiring
> entity *even indirectly,* the hiring entity can fail the ABC test and be
> treated as an employer.

*Id.*, citing *Depianti v. Jan-Pro Franchising Int'l, Inc.,* 990 N.E.2d 1054, 1068 (Mass. 2013) (emphasis added).[5] Other courts have rejected defendants' attempts to avoid the ABC test by engaging intermediary parties. *See Ludlow v. Flowers Foods, Inc.*, 2022 WL 2441295, **3-4 (S.D. Cal. Jul. 5, 2022) (even though plaintiffs contracted only with a subsidiary corporation, parent and other subsidiary corporations may be held liable as employer under the ABC test as they all benefited financially from the work); *Goro v. Flowers Foods, Inc.*, 2021 WL 4295294, **13-14 (S.D. Cal. Sept. 21, 2021) (holding that parent corporation failed Part B even though its subsidiary contracted with the plaintiffs); *Moreno v. JCT Logistics, Inc.*, 2019 WL 3858999, *7 (C.D. Cal. May 29, 2019) ("the ABC test is equally applicable to drivers who contracted directly with Defendants and the drivers hired by carriers who contracted with Defendants").

---

[5] Any suggestion that plaintiffs must prove CEVA to be a "hiring entity" would also fail, as courts have soundly rejected a "hirer" pre-test for applying ABC test. *People v. Uber Technologies, Inc.*, 56 Cal.App.5th 266, 287-88 (2020); *Mejia v. Roussos Construction, Inc.*, 76 Cal.App.5th 811, 818-20 (2022); *Roman v. Jan-Pro Franchising International, Inc.*, 342 F.R.D. 274, 307 (N.D. Cal. 2022); *Ludlow*, 2022 WL 2441295, at **3-4.

1    Here, it is undisputed that Plaintiffs provided services to CEVA, as CEVA

2    admits Drivers "pickup and deliver CEVA freight" and "service the same set of Ceva

3    business clients on a regular basis." AMF-143, 144. Thus, the ABC test applies to

4    CEVA regardless of whether it contracted directly with Plaintiffs.

5    Therefore, whether Cargomatic – a non-party – was party to the TOS with the

6    Plaintiffs is irrelevant to CEVA's defense and CEVA's argument that Cargomatic can

7    prove the ABC test, Dkt-116-1, 18:2-21, is a non-sequitur.[6]

8    ### C.    The Parties' FMCSA "Roles" Do Not Define CEVA's "Usual Course

9    of Business" for Purposes of Part B.

10    CEVA relies on what it calls the "shipper/broker/carrier model established under

11    the FMCSA" to argue that, because it has self-identified as a "shipper," its "*only*

12    business" is shipping goods. Dkt-116-1, 21:6-14. Therefore, CEVA concludes,

13    Plaintiffs' work as "'motor carriers' . . . responsible for actually moving those goods"

14    is outside its usual course of business. This argument fails factually and legally.

15    First, while CEVA proclaims itself a "shipper" under the FMCSA, *see* Dkt-

16    20:26-21:1, the evidence does not support that assertion. *See* RSP-SUF-17. In fact,

17    CEVA's information on the FMCSA website identifies CEVA as a "Carrier/Broker,"

18    not a "shipper," and indicates that it has FMCSA-issued operating authority as both a

19    motor carrier and a freight forwarder. *Id;* AMF-90. Moreover, CEVA is not identified

20    as a "shipper" in its Transportation Services Agreement ("TSA") with Cargomatic and,

21    in deposition, CEVA identified its customers as the shippers and that it "has the

22    customer relationship with the shipper." AMF-99, 166. Thus, the factual predicate that

23    CEVA is only a shipper fails.

24

25    [6] Similarly, CEVA's reliance on *Henderson v. Equilon Enters., LLC,* 40 Cal.App.5th 1111 (2019) and

26    the other "joint employer" cases it cites at Dkt-116-1, 19-9-20, is misplaced, as there, plaintiff sought
to have the ABC test apply as the standard for determining joint employment, which the court

27    rejected. *Id.* at 1125. Here, plaintiffs present a "misclassification" case directly against CEVA, which
raises the very concerns the ABC test was designed to address. *See id.* at 1127-28. The Ninth Circuit
also viewed *Curry v. Equilon Enterprises, LLC,* 23 Cal.App.5th 289 (2018)—another CEVA

28    authority—was "of limited use in the ABC test analysis." *Vazquez,* 986 F.3d at 1128.

1     Aware of the fact that it plays several "roles" in the FMCSA model beyond just
2   shipping, CEVA urges the Court to view its business "through a narrow lens" and
3   ignore "*other* aspects of CEVA's operations in assessing Prong B." Dkt-116-1, 20:23-
4   25, 21:15-17 (emphasis in original). Essentially, CEVA asks the Court to only evaluate
5   its business within the specific context of its relationship with Cargomatic. *See* Dkt-
6   116-1, 10:8-9 ("In its relationship with Cargomatic, CEVA exclusively functions as a
7   shipper."); RSP-SUF-17.
8     This "narrow" application of Part B conflicts with the California Supreme
9   Court's instruction in adopting the ABC test in *Dynamex*, explaining that the "suffer or
10  permit" definition in the wage orders "must be interpreted and applied broadly to
11  include within the covered 'employee' category *all* individual workers who can
12  reasonably be viewed as '*working in the [hiring entity's] business*.'" *Dynamex,* 4 Cal.
13  5th at 953 (*quoting Martinez v. Combs*, 49 Cal. 4th 35, 69 (2010)) (emphasis in
14  original); *see also Vazquez*, 986 F.3d at 1122 (the "suffer or permit to work standard in
15  California wage orders is meant to be exceptionally broad") (internal citation and
16  quotations omitted). As such, Part B is meant to categorize as employees "all
17  individuals who are reasonably viewed as providing services to the business in a role
18  comparable to that of an employee, rather than in a role comparable to that of a
19  traditional independent contractor." *Dynamex*, 4 Cal. 5th at 959.
20    That necessarily requires the Court to assess CEVA's usual course of business as
21  a whole, not just within the context of its self-appointed role in its contract with
22  Cargomatic. To do otherwise defies the broad coverage intended by the ABC test and
23  furthers the type of manipulation of employment status tests the California Supreme
24  Court and Ninth Circuit have cautioned against.
25    Finally, that CEVA has operating authority as a motor carrier, broker, and freight
26  forwarder under the FMCSA also undermines its assertions that the FMCSA
27  establishes the parties' "roles" for the purposes of Part B of the ABC test. While
28  CEVA's rhetoric is suggestive of a federal preemption argument, it offers no case law,

facts, or analysis to support its conclusion that application of Part B would "frustrate federal law based on Congress' intent to regulate the efficient delivery of goods nationally." *See* Dkt-116-1, 20:4-11. Nor could it, since the FMCSA's "primary mission is to prevent commercial motor vehicle-related fatalities and injuries." FMCSA Website, "About Us," *available at* https://www.fmcsa.dot.gov/mission/about-us (last visited June 12, 2025); *see also* U.S. Department of Labor Website, "Who is FMCSA?," *available at* https://www.transportation.gov/briefing-room/safetyfirst/federal-motor-carrier-safety-administration (last visited June 12, 2025) ("FMCSA's mission is to reduce crashes, injuries, and fatalities involving large trucks and buses."). In short, the Parties' roles and/or operating authority under the FMCSA do not change the legal standard for assessing CEVA's usual course of business—nor the Plaintiffs' work within that business—under Part B of California's ABC test.

### D.    CEVA Fails to Prove Part B Under the 3 *Vazquez* Inquiries.

CEVA also fails to prove that it satisfies Part B under the relevant case law. Though CEVA argues that how to assess the "usual course of business" is not "clearly defined," it admits that the Ninth Circuit, in *Vazquez,* has identified three inquiries to guide courts' analysis of Part B: (1) "whether the work of the employee is necessary to or merely incidental to that of the hiring entity," (2) "whether the work of the employee is continuously performed for the hiring entity," and (3) "what business the hiring entity proclaims to be in." *Vazquez,* 986 F.3d at 1125; Dkt-116-1, 22:16-23:21.

Before applying the three *Vazquez* inquiries, CEVA narrowly redefines its business to carve out the very work the Drivers perform. CEVA asserts that the Plaintiffs' work as truck drivers was incidental to CEVA's "usual course of business," because it is "a federally defined shipper in the shipper/broker/carrier context" and thus "not a trucking company." Dkt-116-1, 22:12-15 (citing SUF-18-19), 23:22-23:2 (citing SUF-9). The facts do not support this argument.

First, the evidence cited by CEVA does not prove it is a "shipper:" SUF-18 is not a fact but rather an excerpt from an FMCSA regulation defining "shipper," and though

SUF-19 characterizes CEVA "as a shipper," it is not supported by the cited evidence. *See* RSP-SUF-19. As discussed above, CEVA identifies itself as a "Carrier/Broker" on the FMCSA website and, in any event, CEVA's self-identified role under the FMCSA does not conclude the inquiry under Part B.

Second, SUF-9 does not prove that CEVA is "not a trucking company." To the contrary, SUF-9 states in relevant part: "CEVA Logistics provides a wide range of supply chain solutions for large and medium-size national and multinational companies across the globe, including air, ocean, *ground* and rail freight, as well as warehousing and fulfillment." (emphasis added). Therefore, providing "ground" freight services, like the trucking work done by Plaintiffs, is plainly within CEVA's usual course of business.

CEVA's own facts show that providing trucking services for its customers is necessary to its usual business, including that it "maintains several ground operation facilities throughout California," SUF-23, and that it relies on its own "employee drivers" to transport freight for its customers, SUF-73, 75, 76, 78. Plaintiffs' additional material facts show the employee Company Drivers and Plaintiffs work out of the same facilities, AMF-114, 115, 119, 123, and that CEVA deploys its acknowledged employee drivers and "independent contractor" Drivers like Plaintiffs interchangeably to pick up and deliver CEVA's customers' freight, RSP-SUF-75; AMF-142. CEVA even protects its trucking business by barring Cargomatic and the Drivers from providing trucking services to its customers. AMF-181.

CEVA has acknowledged that its customers are the shippers. RSP-SUF-17; AMF-99, 166. It manages the customer relationship, from booking the orders and determining rates to billing and collections. AMF-133, 167, 168. CEVA provides the warehouse and the staff that regularly interact with and assist the Drivers in handling its customers' shipments. SUF-76, AMF-131-133, 151, 163. CEVA prepares the forms with which the Drivers document their work, AMF-134, 156, 157, and the Drivers submit them to a CEVA employee. SUF-27. CEVA also provides the Drivers some of

1   the necessary tools and equipment. AMF-127-130.

2   Finally, CEVA sets the policies, procedures, and service requirements to which

3   the Drivers were expected to comply. RSP-SUF-64; AMF-170, 171, 177. Cargomatic

4   provided training on CEVA's instructions, and CEVA expected Cargomatic to monitor

5   and take action to ensure Drivers' compliance with service requirements for CEVA and

6   its customers. AMF-169, 171-173, 178-180.

7   CEVA's denial that trucking is part of its freight transportation business is

8   simply not credible given these facts.

9   **1. Plaintiffs' Pickups and Deliveries Were Necessary, Not Incidental to CEVA's Freight Transportation Business**

10

11   Both "common-sense observation" and consideration of "economic terms"

12   confirm that the work of the Plaintiffs and other Drivers was necessary, not merely

13   incidental to CEVA's freight transportation business. *See Vazquez*, 986 F.3d at 1125-

14   26. CEVA misapplies these considerations to argue the Drivers' work was merely

15   "incidental" because "CEVA's success as a business does not depend on Plaintiffs'

16   services, because CEVA's usual course of business is not driving trucks 'day in, day

17   out' nor it is CEVA's only source of profits." Dkt-116-1, 8-10.

18   CEVA cites no law that supports stretching the "common sense" and

19   "economics" considerations to such extremes. Rather, as *Vazquez* illustrates, the

20   analysis should turn on whether the defendant "ultimately depends on someone

21   performing" the work at issue and whether it is "actively and continuously profiting

22   from the performance" of that work. 986 F.3d at 1126.

23   Here, the evidence is clear that CEVA depended on Drivers to carry out the

24   pickups and deliveries in its ground operations, which, as shown below, are the very

25   services it markets and provides in Southern California. CEVA admits that it was

26   "providing trucking services in California directly using independent owner-operators"

27   until 2017, SUF-42, and continued to meet its "trucking needs in California," SUF-16,

28   by requiring those Drivers to provide trucking services via a contract with Cargomatic.

1  SUF-43-44.

2      CEVA's insertion of Cargomatic as a "broker" does not change the fact that it

3  uses Drivers to service its trucking business in California. Many of the drivers who first

4  contracted directly with CEVA continued to provide the same services through

5  Cargomatic. AMF-97. Plaintiffs serviced the same routes and runs for CEVA both

6  before and after CEVA inserted Cargomatic. AMF-105. The Drivers continued to work

7  out of the same CEVA depots, interacting daily with CEVA's depot staff, and

8  executing the pickups and deliveries and documenting the work subject to CEVA's

9  policies, procedures, and requirements. SUF-24, 27; RSP-SUF-26, 51, 52, 60, 64;

10 AMF-105, 116-118, 172, 173, 177-180.

11     CEVA's facts show that it employed Company Drivers to perform ground

12 transportation work, SUF-73, 75, 76, 78, and additional facts show that it continued to

13 do so after Cargomatic came on. RSP-SUF-42; AMF-91, 92, 114, 115, 119, 123, 135,

14 136. Nonetheless, CEVA depended on Drivers like the Plaintiffs to fill its "trucking

15 needs," as additional evidence shows the Drivers perform approximately 90 percent of

16 CEVA's freight movements in California, AMF-153, amounting to approximately 400

17 to 500 shipments a day. AMF-159. The facts therefore support the "common sense"

18 conclusion that CEVA ultimately depends on the services of Drivers like the Plaintiffs

19 to perform the pick-up and delivery services that it offers its customers.

20     The "economic terms" confirm that Drivers are not incidental to CEVA's

21 business. CEVA controls the booking, billing, and collections from its customers, as

22 shown above. While CEVA pays Cargomatic for each shipment and Cargomatic then

23 pays the Driver, SUF-55, 57, CEVA cannot deny that it profits from the shipments the

24 Drivers complete. *See* AMF-168 (CEVA collects payments from its customers for

25 deliveries performed by the Drivers). CEVA cites no case law for the contention that

26 the Drivers' work must be its *only* source of profit.

27     Consequently, the level of integration and economic dependence between the

28 Drivers and CEVA establishes that Plaintiffs' work was necessary and not merely

incidental to CEVA's business. Other cases have cited analogous evidence as showing that the plaintiffs' work was "necessary" to defendants' business under Part B. *See Vazquez,* 986 F.3d at 1126 (noting that "Jan-Pro is actively and continuously profiting from the performance of those cleaning services as they are being performed" supported that "franchisee" janitors' work was necessary to defendant's business); *People v. Uber*, 56 Cal.App.5th at 295-96 ("facts amply" support that drivers "perform services for [Uber and Lyft] in the usual course of defendants' businesses," where "Defendants' businesses depend on riders paying for rides. The drivers provide the services necessary for defendants' business to prosper."); *Herrera v. Flowers Baking Co. of Modesto, LLC*, 2024 WL 2722861, *4 (May 28, 2024 E.D. Cal.) (identifying that bakery defendants negotiated all the contracts to supply retailer customers with product; defendants' relied on "independent" distributors' physical provision of bakery products from its warehouse to its customers—which comprised 85% of defendants' business; defendants' role in setting product pricing, upon which distributors' pay was based; and the use of acknowledged employees to provide similar services); *Goro,* 2021 WL 4295294, at **12-13 (citing in support: "DSD segment," largely comprised of "independent distributors" accounted for 85% of bakery defendants' sales; defendants contract and sell the product to retailer customers; defendants may use their own employees to fulfill distributor duties); *see also S. G. Borello & Sons, Inc., v Dep't of Indus. Rels.*, 48 Cal.3d 341, 357 (1989) ("This permanent integration of the workers into the heart of Borello's business is a strong indicator that Borello functions as an employer . . ."). Because CEVA's business is to provide freight transportation to its customers and Plaintiffs provided the pick-up and delivery segment of those services, Plaintiffs are not incidental to CEVA's usual course of business.[7]

---

[7] The relationship between the Drivers and CEVA is fundamentally different from the one at issue in *Guynn-Neupane v. Magna Legal Services, LLC*, 2021 WL 4481661 (N.D. Cal. Sept. 30, 2021) on which CEVA relies. Here the Drivers are providing the very services for which CEVA markets and contracts to provide its customers where in *Guynn-Neupane,* the plaintiff mock juror "did not collect or analyze data or provide any sort of consulting service" but rather was "a test subject providing data" from which defendant litigation consultant could use in advising its client. *Id.*, *29.

That the Drivers are serving CEVA's customers, not their own, distinguishes Plaintiffs from the plaintiff pet care providers in *Sportsman*, 537 F.Supp.3d 1081, on which CEVA relies. In analyzing Part B, the court in *Sportsman* found the pet care provider's services "distinct" from defendant's website business, as the defendant was not providing pet care to customer pet owners but was merely "providing a marketplace that allows Pet Owners [customers] to find and connect with Pet Care Providers," like the plaintiff. *Id.* at 1094-97. Here, CEVA admittedly has the relationship with the customer, not the Driver.

### 2. Plaintiffs Continuously Worked in CEVA's Freight Transportation Business

CEVA's motion twists the second inquiry under *Vazquez* to be a question about the individual Plaintiffs' work, *see* Dkt-116-1, 26:8-27:16, but Part B is about *CEVA's* business. The Ninth Circuit posed the question of the second inquiry in *Vazquez* as "whether Jan-Pro's business model relies on unit franchisees continuously performing cleaning services." 986 F.3d at 1127. That question dooms CEVA here.

CEVA's facts show that its business has continuously relied on Drivers performing pick-up and delivery services. Until 2017, CEVA relied on drivers under direct contract, like Plaintiffs, to move its customers' freight, SUF-42, and then asked the same group of drivers to sign up with Cargomatic to continue with the same work, SUF-44-47. Ninety percent of CEVA's pickup and delivery assignments in California are given to the Drivers. AMF-153. CEVA regularly depends on approximately 65 Drivers in the facilities where Plaintiffs worked. AMF-114. Plaintiffs themselves worked full-time transporting CEVA freight for several years. AMF-95-97, 105-108. Accordingly, CEVA cannot credibly deny that it has relied on Drivers like Plaintiffs to continuously transport its customers' freight.

CEVA attempts to distract from this straightforward analysis with assertions that address other parts of the ABC test, which it did not raise in its motion. CEVA claims that "Plaintiffs did not perform work for CEVA *at all*," Dkt-116-1, 26:10, based on its

incorrect belief that Part B does not apply if Plaintiffs did not directly contract with CEVA. *See supra,* IV.B. This argument is not credible, given the Drivers ran the same CEVA routes for years, worked nearly exclusively serving CEVA's clients, AMF105, 106-108, out of CEVA's facilities, SUF-24, following CEVA's instructions, AMF-177-180, and rarely if ever rejecting work or serving other customers, RSP-SUF-60; AMF-138-140. Plaintiffs' alleged freedoms, Dkt-116-1, 27:7-16, are not relevant to Part B, but rather to the "control" considerations of Part A of the ABC test. Even if those facts were probative, they are largely disputed, *see* RSP-SUF-60, 61, 64-65, 69, and ignore countervailing evidence of CEVA's control over its business and the Drivers' work. AMF-101-103, 138, 152, 155, 169-181. Similarly, CEVA's unsubstantiated claim that "Plaintiffs hold themselves out as [*sic*] business," Dkt-116-1, 27:6, goes to Part C, not B, and is, in any event, countered by the fact that Plaintiffs did not form legal entities and only filed personal taxes. RSP-SUF-41, AMF-104. The Court should disregard CEVA's arguments on sections of the ABC test that CEVA has not moved on.

In short, CEVA has and does continuously rely on Drivers like the Plaintiffs to provide pickup and delivery services within its freight transportation business. *Vazquez,* 986 F.3d at 1126 (such continuity of work helps distinguish "traditional contractors like electricians and plumbers, who perform incidental services for otherwise unrelated business" from actual employees).

### 3. CEVA Holds Itself Out as a Freight Transportation Business

Finally, *Vazquez* asks what business CEVA "proclaims to be in." 986 F.3d at 1125. CEVA admits that it holds itself out on its website as part of CEVA Logistics' "global logistics network" that provides "end-to-end logistics solutions," which include "warehousing and 'final mile' fulfillment services for goods that are moving through CEVA Logistics' system." Dkt-116-1, 9:13-26. This is buttressed by CEVA Logistics' other public statements—on its website, in SEC filings, and in sworn testimony submitted in other litigation—that CEVA provides ground transportation of freight, including offering the very kind of pickup and delivery services that Plaintiffs

performed. AMF-81-88, 91, 97, 105, 109-113, 115-126.

CEVA misdirects the analysis by asserting that the Court must only consider its role as a "shipper" in relation to its "broker" Cargomatic, which then retains the "carriers," i.e., the Plaintiffs and other Drivers. This argument is legally vacuous. Even if CEVA proved it was a "shipper" (which it has not), there is no support for CEVA's position that the Court should confine its "usual course of business" inquiry to the one part of its business that it "outsourced" through Cargomatic.[8] As discussed above, this "narrow focus" is inconsistent with the broad purpose of the ABC test. To allow a defendant to redefine the nature of its business to exclude the very work being performed by the plaintiffs would circumvent the Part B inquiry, and courts have warned against this type of manipulation of Part B. *See Vazquez*, 986 F.3d at 1127 (noting skepticism of defendants characterizing their business as that of "franchising" with the plaintiff janitors rather than cleaning), *citing*, among other cases, *Da Costa v. Vanguard Cleaning Sys., Inc.*, 2017 WL 4817349, *6 (Mass. Super. Ct. Sept. 29, 2017) ("Vanguard cannot reasonably maintain that commercial cleaning is not part of its ordinary course of business to avoid classifying its workers as employees while simultaneously touting that it is 'a leader in the commercial cleaning industry.'"); *Goro*, 2021 WL 4295294, at *12 (dismissing as "disingenuous" defendant producer and marketer of bread products' argument under Part B that it was only in the "baking business" while plaintiff distributor was in the "transportation business"). To allow CEVA to adjust the focus under which its business is assessed would serve to obscure and promote manipulation of the employment status analysis.

CEVA also improperly attempts to focus on private rather than public statements. CEVA acknowledges that "[o]f importance to this inquiry is how defendant described itself in public advertisements and websites," Dkt-116-1, 28:2-4, quoting

---

[8] CEVA again argues that any conclusion it "markets ground transportation services to its customers," "fails to acknowledge the shipper/broker/carrier paradigm that directs" CEVA's business. Dkt-116-1, 29:2-6. As discussed above, CEVA cites no legal authority to support the conclusion that these FMCSA roles alter the application of Part B here.

*Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274, 306 (N.D. Cal. 2022). *See also Vazquez*, 986 F.3d at 1127 (relying on *Gerber Dental Ctr. Corp. v. Me. Unemployment Ins. Comm'n*, 531 A.2d 1262, 1264 (Me. 1987) and its reliance on defendant's representations in advertising). However, CEVA's assertion that it is a "shipper" is premised solely on its own characterization of the TSA, which is a *private* contract with Cargomatic. Dkt-116-1, 28:16-24. None of CEVA's cited facts (SUF-16-21, 42-46, 49) are supported by *any* evidence of CEVA Logistics' or CEVA Freight's *public* representations about the nature of their business.

CEVA's public statements confirm that the Plaintiffs' work was within CEVA's usual course of business. Contrary to CEVA's claim that its website "clearly undercuts" the "theory" that its "usual course of business includes truck driving," Dkt-116-1, 29:2-4, the website proves the opposite. CEVA's facts confirm CEVA Logistics' "supply chain solutions" include "air, ocean, *ground* and rail freight, as well as warehousing and fulfillment," SUF-9 (emphasis added), and "end-to-end logistics solutions," SUF-11, and that it relies on CEVA Freight for "warehousing and "final mile" fulfillment services for goods that are moving through CEVA Logistics' system." SUF-12. CEVA Logistics' website also includes amongst its listed services "Pick-up and delivery services," "Milk-run collection and delivery," "white glove home delivery," and "high value and sensitive cargo transportation," AMF-85—the very services Plaintiffs provided, AMF-115-126. The website also touts that the CEVA Logistics' network includes "+1,000 trained and uniformed drivers and a fleet [of] *sic* air-ride trailers," AMF 86, and a "**vast ground network and strategic hubs**" that "provide reliable and efficient delivery services to our customers," AMF-87, and "**stable capacities** (trucks and trailers) and **dedicated resources (**own drivers, Independent Contractor partners)," **AMF-88.** Thus, CEVA's own facts and other public representations establish that it holds itself out as providing "truck driving" services to transport its customer freight.

1        Accordingly, all three inquiries under *Vazquez* support the conclusion that the

2    Plaintiffs' pickup and delivery services were within CEVA's usual freight

3    transportation business. CEVA thus cannot prove Part B.

4    **V.    <u>CONCLUSION</u>**

5        CEVA has failed to prove Part B, which is only one of three parts of the ABC

6    test required for its "independent contractor" affirmative defense. Consequently,

7    CEVA's motion for "judgment" must be denied.

8

9    DATED:  June 16, 2025        Respectfully submitted,

10       KAUFMANN & GROPMAN LLP

11       ALTSHULER BERZON LLP

12       HADSELL STORMER RENICK & DAI LLP

13       By:  *<u>/s/ Aaron Kaufmann</u>*

14       AARON KAUFMANN

15       ELIZABETH GROPMAN

16       Attorneys for Plaintiffs

CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, further certifies that this Memorandum of Points and Authorities in Opposition to Defendant CEVA's Motion for Partial Summary Judgment (Dkt. 129) contains 6,954 words, which complies with the word limit set forth in Judge Wright's General Motion Requirements.

By:  */s/ Aaron Kaufmann*

Attorneys for Plaintiffs

PLAINTIFFS' MPA OPPOSING DEFENDANT CEVA'S MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 2:23-CV-00659 ODW (Ex)