**O**

# United States District Court
# Central District of California

| | |
|---|---|
| ROOSEVELT ESPINOSA et al., | Case № 2:23-cv-00659-ODW (Ex) |
| Plaintiffs, | **ORDER RE: MOTIONS FOR** |
| v. | **PARTIAL SUMMARY JUDGMENT** |
| CEVA FREIGHT, LLC, et al., | **[112] [116]** |
| Defendants. | |

## I.      INTRODUCTION

Plaintiffs, thirteen truck drivers, bring this action against Defendant CEVA Freight, LLC, alleging violations of various federal, state, and municipal employment laws.  (Sixth Am. Compl. ("SxAC"), Dkt. No. 103.)   CEVA asserts affirmative defenses, including that CEVA is not Plaintiffs' employer, and that Plaintiffs are independent contractors.    (Answer 22–29, Dkt. No. 105.)    Three Bellwether Plaintiffs—Roosevelt Espinosa, Jose Fernandez, and Manuel Guzman—now move for partial summary judgment, asking the Court to dismiss CEVA's affirmative defenses and find that they are employees.  (Pls.' Mem. P. & A. ISO Mot. Summ. J. ("PMSJ"), Dkt. No. 112-1.)  CEVA also moves for partial summary judgment, asking the Court to find that it has met at least one part of California's three-part test for employment classification, known as the "ABC test," and that only the remaining two parts are

issues left for trial. (Def.'s Mem. P. & A. ISO Mot. Summ. J. ("DMSJ"), Dkt. No. 116-1.) For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Bellwether Plaintiffs' Motion and **DENIES** CEVA's Motion.[1]

## II.    FACTUAL BACKGROUND

The Court derives the factual background, some of which is disputed, from the parties' Statements of Uncontroverted Facts ("SUF"), Statements of Genuine Disputes and Additional Material Facts ("SGD" and "AMF"), and Responses thereto (collectively, the "Statements"), in addition to the parties' clearly and specifically cited evidence. *See* C.D. Cal. L.R. 56-1 to 56-4.

### A.    CEVA Logistics and CEVA

CEVA Logistics is a global logistics network that "provides a wide range of supply chain solutions for large and medium-size national and multinational companies across the globe." (Def.'s SUF ("DSUF") 9, Dkt. No. 116-2.) It advertises itself as "capable of providing global supply chain management and end-to-end logistics solutions." (DSUF 11.) CEVA Logistics maintains a website where it discusses its mission and services. (Pls.' AMF ("PAMF") 83, Dkt. No. 130.) In describing its mission, CEVA Logistics states that it is a "top 5 player in third-party logistics by consistently delivering exceptional end-to-end supply chain solutions in contract logistics, customs, project logistics, FVL and air, ground, and ocean freight." (Pls.' SUF ("PSUF") 5, Dkt. No. 112-2.) Its website indicates that it provides "[p]ick-up and delivery services." (PSUF 7.) CEVA Logistics also states that it can provide transportation services, including "+1000 trained and uniformed drivers," to provide "reliable and efficient delivery services to [its] customers." (PSUF 8–9.)

CEVA Logistics comprises several different companies, including Defendant CEVA Freight ("CEVA"). (DSUF 7.) CEVA itself is considered a "freight forwarder," meaning it is responsible for warehousing and "final mile" fulfillment

---

[1] Having carefully considered the papers filed in connection with the Motions, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

services for goods moving through CEVA Logistics's system.  (DSUF 12.)  While the parties dispute the extent to which freight forwarding services make up CEVA's overall services, it is undisputed that at least some of CEVA's services include freight forwarding.  (Pls.' SGD ("PSGD") 15, Dkt. No. 130.)

**B.    Transition to Cargomatic**

Before 2016, CEVA directly contracted with approximately seventy drivers, including Bellwether Plaintiffs.  (PSUF 19.)   In late 2016 or early 2017, CEVA terminated its contracts with Bellwether Plaintiffs and other drivers carrying freight for CEVA in California.  (PSUF 20.)   CEVA then entered into a Transportation Services Agreement ("TSA") with Cargomatic, a transportation-logistics company that provides drivers and equipment to freight carriers, such as CEVA, and a mobile application for driver use.  (SxAC ¶ 32; Decl. Aaron Kaufmann ISO PMSJ Ex. 6 ("TSA"), Dkt. Nos. 172-1 (sealed)[2], 115-6 (unsealed).)  In the TSA, CEVA agreed to "make best efforts to tender to Cargomatic 90% of shipments." (TSA ¶ 5.)  In return, Cargomatic agreed to "make best efforts to arrange to transport such shipments." (*Id.*) To do so, Cargomatic represented and warranted to CEVA that it would "contract with motor carriers of property," i.e., drivers.  (*Id.* ¶ 2.)   CEVA subsequently notified the drivers with whom it previously contracted that CEVA would no longer contract with them directly.   (DSUF 44.)   Instead, these drivers, such as Bellwether Plaintiffs, would need to contract with Cargomatic independently as licensed motor carriers.  (*Id.* at 46.)

CEVA also notified Bellwether Plaintiffs that they "would need to have a fictitious business name ('DBA') or company to contract with Cargomatic." (*See, e.g.*, Decl. Jose Fernandez ISO Opp'n DMSJ ("Fernandez Decl.") ¶ 4, Dkt. No. 133.) Thus, each Bellwether Plaintiff formed a DBA and sought licenses to transport commercial property.  (*Id.*; CEVA Resp. PSGD ("CEVA Resp.") 41, Dkt. No. 158.)

---

[2] This document is mistakenly labeled in the CM/ECF docket text as "Exhibit 2."

## C.    CEVA, Cargomatic, and Plaintiffs

Since late 2016 or early 2017, Cargomatic has continued to supply drivers for CEVA's transports, most of whom had previously contracted directly with CEVA. (Def.'s SGD ("DSGD") 72–73, Dkt. No. 139.)   Under this arrangement, a CEVA supply-chain specialist coordinates with a customer to schedule pickups and deliveries.  (DSGD 55.)[3]   CEVA then relies on Cargomatic to "arrange, coordinate, and fulfill shipment of CEVA's customers' freight to its final destination." (PSGD 19.)   Cargomatic, in turn, provides drivers with a smartphone application ("App") that it uses to assign freight movements, both CEVA and non-CEVA, to participating drivers.  (DSGD 75; *see* DSUF 37.)  For example, since 2016, at least one of the Bellwether Plaintiffs has performed non-CEVA-related deliveries assigned via the Cargomatic App.  (*See, e.g.*, Decl. Juliana C. Vallier ISO Opp'n PMSJ ("Vallier Decl.") Ex. 8 ("Espinosa Dep. Tr. Excerpt"), Dkt. No. 138-11.)   At issue here, Cargomatic assigned Bellwether Plaintiffs to transport CEVA shipments out of CEVA's Los Angeles and Ontario locations, which average 400 to 500 shipments a day.  (DSGD 81; DSUF 24.)

Once a driver delivers a shipment, he or she submits paperwork to a CEVA employee showing that the CEVA customer's delivery was executed and accepted. (DSUF 27.)   While Cargomatic handles the drivers' (and Bellwether Plaintiffs') payment, (DSUF 28), CEVA directly invoices customers and collects payment for the drivers' deliveries, (DSGD 91).[4]  CEVA and Cargomatic managers also have regular business reviews to ensure drivers are "meeting CEVA's operational expectations and key performance indicators, including on time pickups and deliveries."  (PSUF 84.)

---

[3] Although CEVA indicates that it disputes this fact, it disputes only the assertion that CEVA supply chain specialists "transmit the assignments for dispatching to drivers."  (DSGD 55.)  However, there is no dispute that CEVA supply chain specialists "schedule pickups and deliveries."  (*Id.*)

[4] CEVA purports to dispute this fact, arguing it "[m]isstates the evidence" because "CEVA invoices and collects payment from its customers for all transportation services."  (DSGD 91.)  While that may be true, that does not change Bellwether Plaintiffs' asserted undisputed fact: that CEVA invoices and collects payment for delivery services as well.  Therefore, the Court finds this fact is undisputed.

**D.    Procedural Posture**

On January 27, 2023, Plaintiff Espinosa filed this action.  (Compl., Dkt. No. 1.)
Since then, at least twelve additional Plaintiffs, including Bellwether Plaintiffs, have
joined.  (*See* SxAC.)  In the operative Sixth Amended Complaint, Plaintiffs allege
violations of the federal Fair Labor Standards Act, California labor laws, the
California Unfair Competition Law ("UCL"), and City of Los Angeles municipal
ordinances.  (*Id.* ¶¶ 52–156.)   Given the number of Plaintiffs, the Court ordered,
pursuant to the parties' stipulation, that this action proceed as a bellwether trial.
(Order re Bellwether, Dkt. No. 73.)  Plaintiffs and CEVA each selected one bellwether
plaintiff, with a third plaintiff selected at random.  (Joint Stip., Dkt. No. 68.)

On May 22, 2025, the parties filed cross-motions for partial summary judgment.
As stipulated by the parties, the focus here is simple: "whether the three bellwether
Plaintiffs were improperly classified as independent contractors instead of as
employees." (Joint Appl. 1, Dkt. No. 100.)

## III.        EVIDENTIARY OBJECTIONS

Both parties object to portions of the other's evidence.  Much of the material to
which they object is unnecessary to the resolution of the Motions, and the Court need
not resolve those objections.  For similar reasons, relevance- and foundation-based
objections are moot in the context of summary judgment motions.  *Burch v. Regents
of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Moreover, the Court
does not consider improper argument and legal conclusions in the parties' Statements,
(*see* Scheduling & Case Management Order ("Scheduling Order") 7–9, Dkt. No. 32),
so any objections on those bases are also moot.  As for hearsay, a court may not grant
a summary judgment motion on the basis of hearsay evidence, but it may deny a
summary judgment motion on the basis of hearsay evidence as long as it finds that the
hearsay evidence would be admissible at trial.   Fed. R. Civ. P. 56(e); *Fraser v.
Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).  Finally, to the extent the Court
relies on objected-to evidence in this order without further objection, those objections

have been thoroughly considered and are overruled.  *See Burch*, 443 F. Supp. 2d
at 1122 (proceeding with only necessary evidentiary rulings).

### IV.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" where it might
affect the outcome of the suit under the governing law, and the dispute is "genuine"
where "the evidence is such that a reasonable jury could return a verdict for the
nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The
burden of establishing the absence of a genuine issue of material fact lies with the
moving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the moving party satisfies its initial burden, the nonmoving party cannot
simply rest on the pleadings or argue that any disagreement or "metaphysical doubt"
about a material issue of fact precludes summary judgment.  *Matsushita Elec. Indus.
v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see Celotex*, 477 U.S. at 324.  The
non-moving party must show that there are "genuine factual issues that . . . may
reasonably be resolved in favor of either party."  *Cal. Architectural Bldg. Prods., Inc.
v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*,
477 U.S. at 250) (emphasis omitted).  Courts should grant summary judgment against
a party who fails to make a sufficient showing on an element essential to her case
when she will ultimately bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322–
23.

In ruling on summary judgment motions, courts "view the facts and draw
reasonable inferences in the light most favorable" to the nonmoving party.  *Scott v.
Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks omitted).  Thus, when
parties file cross-motions for summary judgment, the court "evaluate[s] each motion
separately, giving the nonmoving party in each instance the benefit of all reasonable
inferences."  *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir.

2006). The court considers "each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). Conclusory, speculative, or "uncorroborated and self-serving" testimony will not raise genuine issues of fact sufficient to defeat summary judgment. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Thornhill Publ'g Co. v. GTE Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Moreover, though the Court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

The Court may assume that material facts claimed and adequately supported are undisputed except to the extent that such material facts are (a) included in the opposing party's responsive statement of disputes *and* (b) controverted by declaration or competent written evidence. C.D. Cal. L.R. 56-4. The Court is not obligated to look any further in the record for supporting evidence other than what is actually and specifically referenced. *Id.*

## V.    DISCUSSION

Both parties' Motions concern CEVA's Second and Third Affirmative Defenses. CEVA's Second Affirmative Defense asserts that CEVA "was not Plaintiffs' employer," while its Third Affirmative Defense asserts that Plaintiffs were independent contractors. (Answer 22.)

Bellwether Plaintiffs seek partial summary judgment as to both defenses on the basis that CEVA is considered Bellwether Plaintiffs' employer as a matter of law. (PMSJ 1–2.) Bellwether Plaintiffs argue that in determining employment status, the Court must apply the ABC test as laid out in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018), and codified in California Labor Code section 2775. (*Id.* at 13–15.) Bellwether Plaintiffs also ask the Court to find that CEVA cannot prove the second prong of the ABC test. (*Id.* at 15–18.)

CEVA also seeks partial summary judgment and asks the Court to find the converse of Bellwether Plaintiffs' position: that the ABC test does *not* apply, and that even if it *does* apply, CEVA has proven at least the second prong of the test. (DMSJ 29–30.)

The Court addresses these issues in two parts. First, the Court examines the applicable test in this matter and determines whether the ABC test must apply, or alternatively whether a triable issue exists as to its applicability such that another test could govern. Second, and irrespective of the answer to the first question, the Court examines whether CEVA can satisfy or has satisfied the second prong of the ABC test.

## A.    Applicable Test

Under California law, and for purposes of California wage orders, "any worker who performs work for a business is presumed to be an employee who falls within the protections afforded by a wage order." *Vazquez v. Jan-Pro Franchising Int'l*, 10 Cal. 5th 944, 948 (2021). The hiring entity can overcome this presumption, and thereby establish that a worker is *not* an "employee," by establishing each of the three elements in the ABC test. *Dynamex*, 4 Cal. 5th at 956–57. To carry its burden under the ABC test, a hiring entity must establish each of the following:

> (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; and (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

*Id.* at 957 (emphasis omitted); *see* Cal. Lab. Code § 2775 (codifying the ABC test).

CEVA contends that it need not satisfy the ABC test at all. (DMSJ 17–20; Opp'n PMSJ 15–17, 23–28, Dkt. No. 138.) CEVA advances two arguments. First, it argues that, because *Cargomatic* satisfies the ABC test, the Court should not also apply the test to *CEVA*. (DMSJ 17–20; Opp'n PMSJ 15–17.) Second, it argues that

the business-to-business exception, found in California Labor Code section 2776(a), applies here and removes this case from *Dynamex* and the ABC test, instead requiring analysis under the California Supreme Court's decision in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989).  (Opp'n PMSJ 23–28.)

       *1.*    *Cargomatic and the ABC Test's Applicability to CEVA*

       CEVA first argues that, because Cargomatic satisfies the ABC test, "Plaintiffs should not be able to sidestep Cargomatic to apply the ABC test to another entity like CEVA."  (*Id.* at 15–16 (emphasis omitted).)  CEVA further claims that application of the ABC test here, despite Cargomatic's apparent satisfaction of the test, would lead to "illogical results."  (*Id.* at 16–17.)

       *a.*    <u>Applying the ABC test to Cargomatic and CEVA</u>

       The Court is unpersuaded by CEVA's argument that the Court cannot apply the ABC test here just because Cargomatic may already satisfy it.  First, neither the California Labor Code nor *Dynamex* contemplates such an exception.  The California Labor Code contains nine express exceptions to the ABC test.  Cal. Lab. Code. §§ 2776–2784.  These include, among others, the business-to-business exception, *id.* § 2776, a referral agency/service provider exception, *id.* § 2777, and a professional services exception, *id.* § 2778.  However, none of these exceptions include two hiring entities that each satisfy the ABC test.  Considering how thorough the Legislature was in listing exceptions to the ABC test, the Court declines to read in another exception that the Legislature did not expressly list.  *See Castillo v. Metro. Life Ins. Co.*, 970 F.3d 1224, 1232 (9th Cir. 2020) ("The [negative implication] canon applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." (citation modified)).

       *Dynamex* also does not support such an exception.  The *Dynamex* court held that "the suffer or permit to work standard must be interpreted and applied broadly." *Dynamex*, 4 Cal. 5th at 953.  The result of such a broad interpretation is that "*all* individual workers who can reasonably be viewed as working in the hiring entity's

business" are considered employees, rather than independent contractors. *Id.* This clear and unequivocal language does not include space for an exception where "all" means "all unless the worker is already viewed as working in another hiring entity's business."

Second, CEVA's authority does not support its proposed exception. CEVA cites only one California Court of Appeal case, *Henderson v. Equilon Enterprises, LLC*, 40 Cal. App. 5th 1111 (2019). (*Id.* at 16.) In *Henderson*, the plaintiff—a manager of several Shell-branded gas stations—sued both the gas station operator and Shell for various wage-order violations. 40 Cal. App. at 1114–15. The plaintiff asserted that both the operator and Shell were equally liable under a "joint employer" theory of liability. *Id.* at 1114. As CEVA does here, Shell asserted in *Henderson* that it was not the plaintiff's employer and argued that the ABC test in *Dynamex* should not apply. *Id.* at 1114, 1125. The court agreed, concluding that "the ABC test in *Dynamex* does not fit analytically with and was not intended to apply to claims of joint employer liability." *Id.* at 1125. Rather, the court in *Dynamex* "was concerned with the problem of businesses misclassifying workers as independent contractors so that the business may obtain economic advantages." *Id.* at 1127. However, the court in *Henderson* reasoned, those policy concerns do not exist in a "joint employer" claim because "the worker is an admitted employee of a primary employer." *Id.* at 1128. Rather, the animating policy concern in a joint employer claim is ensuring that, where "the primary employer is unwilling or no longer able to satisfy claims of unpaid wages," the worker may "look to another business entity that may be separately liable as their employer." *Id.*

*Henderson* is distinguishable for two reasons. First, it concerns the ABC test's application to "joint employer" claims, and Plaintiffs bring no such claims here. (*See generally* SxAC.) Second, and more importantly, the policy concerns in *Henderson* are wholly different from those implicated in this case.

The Ninth Circuit's decision in *Vazquez v. Jan-Pro Franchising International, Inc.*, is instructive. 986 F.3d 1106 (9th Cir. 2021). There, the defendant—a franchisor that organized commercial cleaning franchises—contracted with several third-party franchisees for them to use the franchisor's logo. *Id.* at 1111, 1118. The third-party franchisees would then act as franchisors, selling their business plans to individual franchisees. *Id.* Several of those individual franchisees sued the original franchisor, alleging that the system was a farce and they were "direct employee[s] of" the original franchisor. *Id.* at 1112. In the wake of *Dynamex*, the parties disputed whether the ABC test applied to that "three-tier franchise model." *Id.* at 1111.

To resolve this question, the Ninth Circuit looked not only to *Dynamex* but also to Massachusetts state law, as "*Dynamex* embraced the Massachusetts version of the [ABC] test." *Id.* at 1122. The Massachusetts Supreme Judicial Court ("SJC") had concluded, before *Vazquez*, that "the ABC test applies to a dispute between a putative employee and a hiring entity even if they are not parties to the same contract." *Id.* at 1124 (citing *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass. 607, 623–24 (2013)). The Massachusetts SJC aptly illustrated this principle with an example particularly relevant here:

> [C]ompany A contracts with company B for services, and company B enters into arrangements with third parties to perform the work it undertook under its contract with company A. We agree that ordinarily, in such circumstances, company A would not be liable for misclassification of the third-party workers. This is because ordinarily, in such circumstances, company B would be the agent of any misclassification. However, here [plaintiff] alleges that [company A], and not [company B], designed and implemented the contractual framework under which he was misclassified as an independent contractor. The lack of a contract between [plaintiff] and [company A] does not itself preclude liability. Where a party is the agent of misclassification, it may be directly liable under [the ABC test], even where it utilizes a proxy to make arrangements with its employees.

*Depianti*, 465 Mass. at 624 n.17 (citation modified).

Just as in *Depianti*, Plaintiffs allege that CEVA, not Cargomatic, terminated its drivers and now relies on a proxy to contract with and pay them, thereby circumventing California's labor laws.  (SxAC ¶¶ 5–6.)  While unproven at this stage—and the Court does not accept it as true for the purposes of this decision—allegations like these, and the policy concerns they implicate, lead the Court to conclude that the ABC test *could* be applied to CEVA here even if Cargomatic satisfied it.  *See Vazquez*, 986 F.3d at 1124 (applying the ABC test in a three-tier employment model).  Where the court in *Henderson* was concerned with ensuring that a plaintiff could look to another joint employer to satisfy employer liability, the ABC test is concerned with preventing a putative employer from circumventing labor laws by inserting a proxy between itself and the worker, just as Plaintiffs contend CEVA is doing here.

### b.    "Illogical results"

CEVA also points to several "illogical results" that will follow if the Court applies the ABC test to CEVA even if Cargomatic satisfies the test.  First, CEVA argues that Cargomatic already properly classified Plaintiffs as independent contractors.  (Opp'n PMSJ 16.)  However, this is the same scenario that the Ninth Circuit considered in *Vazquez*.  986 F.3d at 1112.  There, despite an agreement between the third-party franchisor and the independent franchisee-plaintiffs deeming the plaintiffs to be "at all times . . . independent contractor[s]," the Ninth Circuit held that the ABC test still applied to the original franchisor.  *Id.* at 1112, 1121–22.  The same is true here.  Even assuming Cargomatic did "properly classif[y]" Plaintiffs as independent contractors, the ABC test still applies to CEVA.

Second, CEVA argues that "[a]pplying the ABC test to *any* alleged hiring entity would create absurd conclusions," such as the possibility that Plaintiffs could have "several different 'employers' each day."  (Opp'n PMSJ 16–17.)  But California courts have consistently recognized that business models involving multiple employers do not preclude application of the ABC test to determine the employer/employee

relationship. *See, e.g.*, *People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 294 (2020) ("The dispositive issue [in *Dynamex*] was not whether the defendant and its drivers followed what might be viewed as a traditional employment model . . . but whether the mode in which the drivers were utilized met the elements of the ABC test."). Moreover, the ABC test "does not prohibit the use of independent contractors" in the shipping context. *People v. Superior Ct. (Cal Cartage Transp. Express, LLC)*, 57 Cal. App. 5th 619, 630 (2020). Considering that courts have contemplated multiple-employer business models, including in the shipping context, the Court is unconvinced that applying the ABC test here would lead to a result where Plaintiffs would unjustly have "several different 'employers' each day." (Opp'n PMSJ 16–17.)

Third, CEVA argues that applying the ABC test "would undermine the entire shipper-broker-carrier model" established by the Federal Motor Carrier Safety Administration ("FMSCA") and "frustrate Congress'[s] intent to regulate the efficient delivery of goods nationally." (Opp'n PMSJ 17.) However, CEVA does not cite, nor does the Court find, any authority for these propositions. In fact, at least one court has explicitly stated that the FMCSA's regulations do not preempt *Dynamex* and state laws governing "when an employee relationship exists or under what terms." *W. States Trucking Ass'n v. Schoorl*, 377 F. Supp. 3d 1056, 1072–73 (E.D. Cal. 2019). Moreover, Congress's intent in establishing the FMSCA was not the "efficient delivery of goods," as CEVA argues, but rather "to reduce the number and severity of large-truck involved crashes." Motor Carrier Safety Improvement Act, § 4(2), Pub. L. No. 106-159, 113 Stat. 1748 (1999). Congress explicitly tasked the FMCSA to ensure "the highest degree of safety in motor carrier transportation." *Id.* § 101. While the FMSCA has adopted safety regulations that preempt certain California wage orders, *see Int'l Brotherhood of Teamsters, Local 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 845–46 (9th Cir. 2021), nothing suggests that applying the ABC test here would interfere with or frustrate Congress's intent to promote motor-carrier safety, *see Schoorl*, 377 F. Supp. 3d at 1073 ("*Dynamex's* interpretation of California

wage orders has, at best, only a tangential impact on safety concerns and do not conflict with the federal Regulations, which do not govern when an employee relationship exists or under what terms.").

Therefore, the Court finds that it may apply the ABC test to CEVA even if Cargomatic also satisfied test.

### 2. Business-to-Business Exception

CEVA also argues that the ABC test does not apply to it because Plaintiffs are engaged in a business-to-business relationship with CEVA. (Opp'n PMSJ 23–28.) Under California Labor Code section 2776, *Dynamex* and the ABC test "do not apply to a bona fide business-to-business contracting relationship." To establish the exception of a business-to-business contracting relationship, the contracting business (here, CEVA) must "demonstrate that [twelve elements] are satisfied." Cal. Lab. Code § 2776(a). Only where the contracting business proves all twelve elements do courts apply the test articulated in *Borello* rather than *Dynamex* and the ABC test.

Bellwether Plaintiffs argue that this business-to-business exception cannot apply here because it requires a "contracting relationship" between the contracting business (here, CEVA) and the business service provider (here, Plaintiffs), and Plaintiffs did not contract directly with CEVA. (Reply PMSJ 4, Dkt. No. 157.) Bellwether Plaintiffs also argue that, even if the business-to-business exception could apply here, CEVA lacks the evidence to prove at least three of the elements required. (*Id.* at 4–5.)

### a. Statutory interpretation

Bellwether Plaintiffs first argue that the exception does not apply because "CEVA does not contract directly with Plaintiffs." (*Id.* at 4.) To determine whether the business-to-business exception requires a direct contracting relationship, the Court "start[s], of course, with the statutory text." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). The Court "look[s] to legislative intent" only if there is any ambiguity in the

text of the statute.  *Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005).

The text of section 2776 states that *Dynamex* does not apply to "bona fide business-to-business contracting relationships."  Section 2776(a) defines a business-to-business contracting relationship, in part, as a situation where a "[business service provider] contracts to provide services to [a contracting business]."  Read plainly, this language does not impose a requirement that the business service provider contract directly *with* the contracting business.  Instead, it requires only that the business service provider enter a contract which benefits, i.e., "provide[s] services," to the contracting business.  If the Legislature had intended that the business service provider contract directly with the contracting business, it could have easily done so by using the word, "with."  It did not.  Instead, it chose to use the words "*to provide services to*."  Thus, the Court finds that the plain language of section 2776(a) does not require a direct contracting relationship.

The language of section 2776(b), although inapplicable here, supports that section 2776 does not require a direct contracting relationship.  Section 2776(b) provides that, where "two bona fide businesses are contracting with one another under the conditions set forth in [section 2776(a)]," the business-to-business exception does not apply.  Two inferences can be drawn from this provision.  The first is that a scenario exists under section 2776(a) where two bona fide businesses are *not* contracting with one another.  The second is that the Legislature knew how to unambiguously state when businesses must contract directly with one another.  As the Legislature did so in section 2776(b), but not in section 2776(a), the Court understands the Legislature intended different meanings in each section.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the [L]egislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").

Admittedly, some ambiguity exists between the term itself—"business-to-business contracting relationship," § 2776—and its definition—the relationship where a "('business service provider') contracts to provide services to [a] . . . ('contracting business')," § 2776(a). Thus, the Court turns to legislative intent to clarify the resulting ambiguity. *See Cleveland*, 420 F.3d at 989.

The Legislative Counsel's Digest ("Digest") of Assembly Bill ("AB") 2257, the AB that enacted section 2775 and codified the ABC test, supports the above reading that the "business service provider" need not contract directly with the "contracting business." "California courts presume that the Legislature acted with the intent and meaning expressed in the Legislative Counsel's Digest." *Sebastian Int'l, Inc. v. Russolillo*, 151 F. Supp. 2d 1215, 1219 (C.D. Cal. 2001) (citation modified) (citing *People v. Henson*, 57 Cal. App. 4th 1380, 1386 (1997)). As relevant here, the Digest states that "[t]he bill would revise the conditions pursuant to which business service providers providing services pursuant to contract to another business are exempt" from application of the ABC test. A.B. 2257, 2019–2020 Leg., Reg. Sess. (Cal. 2020). Put more simply, the intent of the bill was to codify an exception to the ABC test when a "business service provider[] provid[es] services pursuant to contract to another business." *See id.* This is consistent with the statutory text in section 2776(a). As with the statutory text, the Digest's language evinces two requirements: (1) that Business A (the "business service provider") is providing services pursuant to a contract, and (2) that Business A is providing those services *to* Business B (the "contracting business"). However, nothing in the Digest evinces a requirement that Business A's contract be directly *with* Business B.

Therefore, based on both the plain statutory language and the legislative intent of section 2776, the Court finds that the business-to-business exception to the ABC test can apply even where the business service provider does not contract directly with the contracting business. As such, the Court rejects Bellwether Plaintiffs' first argument that the business-to-business exception does not apply on this basis.

b.    Business-to-business exception elements

Bellwether Plaintiffs next argue that CEVA cannot meet three of the twelve elements required for the business-to-business exception to apply.  (Reply PMSJ 4–5.)

To determine whether a business-to-business contracting relationship exists, the contracting business (here, CEVA) must establish that twelve statutorily enumerated elements are satisfied.  Cal. Lab. Code § 2776(a)(1)–(12).  If the contracting business cannot "establish any one of the criteria, the inquiry ends."  *Thoma v. VXN Grp. LLC*, No. 2:23-cv-04901-WLH  (AGRx),  2025 WL  1766337,  at *17  (C.D. Cal.  Mar. 11, 2025) (citing *Lawson v. Grubhub, Inc.*, 665 F. Supp. 3d 1108, 1114 (N.D. Cal. 2023)).\

As Bellwether Plaintiffs seek summary judgment, it is Bellwether Plaintiffs who bear the initial burden to show an "absence of evidence" to support any prong of the business-to-business exception.  *Bowerman v. Field Asset Servs. Inc.*, No. 3:13-cv-00057-WHO,  2024 WL  218122,  at *4  (N.D. Cal.  Jan. 19,  2024)).    Only once Bellwether Plaintiffs meet that initial burden does the burden shift to CEVA to "designate specific facts showing that there is a genuine issue for trial."  *Id.* (citation modified) (quoting *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021)).

Bellwether Plaintiffs point only to an absence of evidence for the second, third, and eighth elements.  (Reply PMSJ 4–5.)  The Court finds that Bellwether Plaintiffs fail to meet their initial burden as to all three challenged elements.

The second element requires that "[t]he business provider" (here, Plaintiffs) are "providing services directly to the contracting business rather than to customers of the contracting business."  Cal. Lab. Code § 2776(a)(2).  Bellwether Plaintiffs argue that "CEVA cannot prove that Plaintiffs were 'providing services directly to [CEVA] rather than to [CEVA's customers]'" because "CEVA admits that 'Plaintiffs transported freight . . . for CEVA's customers.'"  (Reply PMSJ 5.)  This argument relies on a "'strained reading' of section 2776."  *Bowerman*, 2024 WL 218122, at *7 (citing *Cal Cartage*, 57 Cal. App. 5th at 634).  CEVA could meet this element by demonstrating

that "[s]ervices [are] provided by [Plaintiffs] directly to [CEVA], notwithstanding that those services would include moving freight belonging to [CEVA's] customers." *Cal Cartage*, 57 Cal. App. 5th at 634. Thus, it is not dispositive of the second element that CEVA admits that Plaintiffs carry its customers' freight.

The third element requires that "[t]he contract with the business service provider is in writing and specifies the payment amount, including any applicable rate of pay, for services to be performed, as well as the due date of payment for such services." *Id.* § 2776(a)(3). Bellwether Plaintiffs contend that CEVA cannot prove that "the contract with [Plaintiffs] is in writing" because "CEVA does not contract with Plaintiffs." (Reply PMSJ 4.) This argument follows the same logic as Bellwether Plaintiffs' argument above, that section 2776 requires a direct contracting relationship between the business service provider and the contracting business. As the Court has already concluded that Plaintiffs need not contract directly with CEVA for the business-to-business exception to apply, this derivative argument also fails. Moreover, the third business-to-business exception element does not require that the contract be with the contracting business; it requires only that whatever contract "the business service provider" has entered into be in writing. Cal. Lab. Code § 2776(a)(3).

Finally, the eighth element requires that "[t]he business service provider advertises and holds itself out to the public as available to provide the same or similar services." *Id.* § 2776(a)(8). Bellwether Plaintiffs argue that there is "no evidence that each Plaintiff 'advertise[d] and [held] itself out to the public as available to provide the same or similar services." (Reply PMSJ 5 (emphasis omitted).) Specifically, they argue that "CEVA's evidence that Plaintiffs occasionally worked for and were available to other companies through the Cargomatic app is insufficient" to satisfy the eighth element. (*Id.*) However, Bellwether Plaintiffs cannot deny that the record contains at least some evidence they used Cargomatic for non-CEVA jobs, thus providing the same or similar services to other companies. (Espinosa Dep. Tr.

Excerpt 212:25–214:3 (acknowledging that he was paid by Cargomatic for non-CEVA work).)  At this stage, the Court must draw inferences from that evidence in favor of CEVA as the non-moving party here, *A.C.L.U. of Nev.*, 466 F.3d at 790–91, and a reasonable factfinder could find that Plaintiffs' making themselves available on the Cargomatic App for non-CEVA work satisfies this element.

Bellwether Plaintiffs rely on *Lawson*, in which the court found evidence that a plaintiff worked for competitors, without more, was insufficient to satisfy the eighth element.  665 F. Supp. 3d at 1116.  But in *Lawson*, that plaintiff worked for competitors was the *only* evidence offered on the issue.  Here, CEVA relies not only on evidence that Plaintiffs worked for non-CEVA entities, but also on evidence that Plaintiffs made themselves available to other shippers on Cargomatic's App.  (Opp'n PMSJ 27.)  This additional fact—that Plaintiffs made themselves available on an online platform—allows a reasonable trier of fact to find that Plaintiffs advertise and hold themselves out to the public.[5]  *See Bowerman*, 2024 WL 218122, at *12 (finding that a business's placement on LinkedIn was sufficient evidence for a trier of fact to determine that the eighth element was satisfied).

In summary, Bellwether Plaintiffs have failed to show an "absence of evidence" as to the second, third, and eighth elements of the business-to-business exception.  *See Bowerman*, 2024 WL 218122, at *4.  Consequently, there remains a genuine issue of material fact as to whether the business-to-business exception applies.  As the business-to-business exception could apply, there is a possibility that the ABC test will not govern employment determination in this matter.  Considering Bellwether Plaintiffs' Motion "is premised solely on the ABC test," (Reply PMSJ 5 n.5), the Court cannot fully grant Bellwether Plaintiffs' Motion or conclude that CEVA cannot prevail on its second and third affirmative defenses.  Having found that the ABC test

---

[5] CEVA also asserts that Plaintiffs' "motor carrier services were publicized [on] . . . a website operated by the federal [Department of Transportation.]"  (Opp'n PMSJ 27.)  However, neither the cited SUF nor the underlying evidence support CEVA's contention.

1    could—but may not—apply, the Court turns to the remaining issue: whether either

2    party is entitled to judgment as to Prong B of the ABC test.

3    **B.    Prong B of the ABC Test**

4        Both parties move for summary judgment as to Prong B of the ABC test:

5    Bellwether Plaintiffs argue CEVA cannot satisfy Prong B, while CEVA argues it does

6    not have to and, in any event, it can and has.  (PMSJ 18; DMSJ 29–30.)

7        Prong B of the ABC test asks whether "the person performs work that is outside

8    the usual course of the hiring entity's business."  Cal. Lab. Code § 2775(b)(1)(B).

9    This element "reflects the distinction between workers who are truly independent

10   contractors and those whose work involves the hiring entity's usual course of

11   business."  *Vazquez*, 986 F.3d at 1125.  In *Vazquez*, the Ninth Circuit developed a

12   three-party inquiry to guide analysis of Prong B: (1) "whether the work of the

13   employee is necessary to or merely incidental to that of the hiring entity,"

14   (2) "whether the work of the employee is continuously performed for the hiring

15   entity," and (3) "what business the hiring entity proclaims to be in."  *Id.*  Of the three

16   ABC test prongs, Prong B "may be the one most susceptible to summary judgment."

17   *Id.*  However, the Court must first "determine whether summary judgment is

18   warranted on the current record."  *Id.*

19       CEVA asks the Court to find that it has satisfied Prong B, leaving only Prongs A

20   and C for trial.  (DMSJ 30.)  Specifically, CEVA argues that federal regulations define

21   the roles of CEVA and Plaintiffs here, requiring the Court to bypass the *Vazquez*

22   factors and find that CEVA satisfies Prong B under those regulations.  (*Id.* at 20–22.)

23   CEVA also argues that, even if the Court does apply *Vazquez*, the evidence shows it

24   has met Prong B.  (*Id.* at 22–29.)  Bellwether Plaintiffs argue that under the *Vazquez*

25   factors, CEVA cannot satisfy Prong B.  (PMSJ 13–18.)  Consequently, Bellwether

26   Plaintiffs argue, because the ABC test is written in the conjunctive, CEVA cannot

27   satisfy the ABC test.  (*See id.* at 18.)

28

### 1.    FMSCA Regulations

In another pseudo-preemption argument, CEVA argues that because the FMSCA define CEVA's and Plaintiffs' roles separately, the Court should bypass the *Vazquez* factors and find that Plaintiffs' work falls outside CEVA's usual course of business.  (DMSJ 20–22.)   For support, CEVA cites 49 C.F.R. § 375.103, which provides the regulations' definitions.  (*Id.* at 20–21.)  CEVA argues Plaintiffs fit the definition of "[h]ousehold goods motor carrier," and that CEVA fits the definition of "shipper."  (*Id.*); 49 C.F.R. § 357.103.   According to CEVA, because CEVA and Plaintiffs have "specifically defined roles under applicable federal regulations," Plaintiffs must provide services that are different than CEVA's and are, therefore, "outside the course of CEVA's business."  (DMSJ 21.)  Thus, CEVA urges the Court to find Prong B satisfied based on the regulations' definitions, without analyzing the *Vazquez* factors.  (*Id.* at 22.)

This argument is unavailing.  As an initial matter, CEVA has not cited—nor has the Court found—any authority permitting a court to bypass the *Vazquez* factors simply because a federal regulation, for convenience or clarity, provides definitions that the parties might fit.  Moreover, as the Court noted above, the FMSCA is a safety agency.   Its regulations guide motor carriers in complying with FMSCA's safety regulations; they do not delineate entities for purposes of wage and hour laws.

CEVA argues that if the Court does not find that CEVA satisfies Prong B by virtue of the FMSCA's definitions, it would "elevate[] California's ABC test *over* and *above* the" FMSCA's regulations.  (DMSJ 21.)  However, Congress has not indicated that the FMSCA's regulations have any preclusive effect over the ABC test.  It is true that Congress has disapproved of certain California laws that it finds disadvantageous "to motor carriers who used a large proportion of independent contractors."  *People ex rel. Harris v. Pac Anchor Transp., Inc.*, 59 Cal. 4th 772, 787 (2014) (citing Congressional records).  Yet it has not, as far as the Court can tell, disapproved of the ABC test.  Rather, as at least one other court has found, the ABC test is "not the type

21

of law Congress intended to preempt." *Cal Cartage*, 57 Cal. App. 5th at 619.  Instead, it is a law of "general application," *id.*, that leaves putative employers "free to use independent contractors as long as they are properly classified," *Pac Anchor*, 59 Cal. 4th at 787.

Therefore, CEVA fails to demonstrate that the Court should bypass the *Vazquez* factors and find Plaintiffs work falls outside of CEVA's usual course of business by virtue of FMSCA regulatory definitions.

### 2.    Applying Prong B

The Court now turns to the *Vazquez* factors: (1) whether Bellwether Plaintiffs are necessary or merely incidental to CEVA's work; (2) whether CEVA's business model continuously relies on Bellwether Plaintiffs' services; and (3) how CEVA describes itself.  *Vazquez*, 986 F.3d at 1125.  Bellwether Plaintiffs argue that CEVA cannot satisfy Prong B, while CEVA argues it can and has.  (PMSJ 18; DMSJ 29–30.) Evaluating "each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences," *A.C.L.U. of Nev.*, 466 F.3d at 790–91, the Court finds no genuine issue of material fact and concludes that Bellwether Plaintiffs are entitled to summary judgment on Prong B.  Fed. R. Civ. P. 56(a).

#### a.    Necessary or merely incidental

The first *Vazquez* factor asks whether the "putative employees were 'necessary' or 'incidental' to the hiring entity's business."  *Vazquez*, 986 F.3d at 1125.   This inquiry can be "conducted through a common-sense observation of the nature of the business" or "in more economic terms."   *Id.* at 1125–26.  For example, in a common-sense analysis, courts have found that "'floor measurers' are necessary to the business of a carpet retailer and, thus, were in the same business as the retailer."  *Id.* at 1125–26 (citing *Carpetland U.S.A., Inc. v. Ill. Dep't of Emp. Sec.*, 201 Ill. 2d 351, 386 (2002)).   Under an economic analysis, courts view putative employees as necessary when the hiring entity "derive[s] [its] profits from the earnings of the [putative employees]," and thus, "the work of the [putative employees is] necessary to

the success of the [hiring entity]." *Id.* at 1126 (citing *O'Hare-Midway Limousine Serv., Inc. v. Baker*, 232 Ill. App. 3d 108, 112–13 (1992)); *see also Lawson*, 665 F. Supp. 3d at 1120 (finding putative employees' delivery services "necessary" to the business of food delivery application company because the company "made more money if drivers made more deliveries").

The facts material to this factor are undisputed. CEVA is a freight-forwarder, meaning that it is responsible for warehousing customer cargo and ensuring that the cargo reaches the intended destination. (DSUF 15.) While the parties dispute *how much* of CEVA's freight movements in California Bellwether Plaintiffs perform, it is undisputed that Bellwether Plaintiffs move *at least some* of this cargo. (PSGD 15.) Furthermore, CEVA has regular meetings with Cargomatic managers to ensure Bellwether Plaintiffs are "meeting CEVA's operational expectations and key performance indicators." (PSUF 84.)

Under a common-sense approach, and even if viewing this undisputed evidence in the light most favorable to CEVA, there is only one inference: CEVA needs drivers, like Bellwether Plaintiffs, to transport its customers' containers. Without drivers like Bellwether Plaintiffs, CEVA would have no means by which to transport cargo over ground and would be unable to provide "reliable and efficient delivery services to [its] customers." (PSUF 8–9.) Thus, drivers like Bellwether Plaintiffs are just as necessary to CEVA's business as "floor measurers" are to a "carpet retailer." *Vazquez*, 986 F.3d at 1125.

An economic inquiry leads to the same conclusion. Similar to above, the parties may dispute *how much* of CEVA's profits derive from the work of Bellwether Plaintiffs (and other drivers), but they do not dispute that CEVA collects *some* payments for Bellwether Plaintiffs' work. (DSGD 91.) It is similarly undisputed that CEVA regularly performs performance reviews of Cargomatic drivers, which supports the inference that a Bellwether Plaintiffs' failure to "meet[] CEVA's operational expectations and key performance indicators" somehow impacts CEVA's bottom line.

(PSUF 84.)   As CEVA derives at least *some* portion of its profits from Bellwether Plaintiffs' labor and CEVA is not "indifferent to . . . how well [Bellwether Plaintiffs] perform [their] work," Bellwether Plaintiffs are necessary to the success of CEVA's business in an economic sense.   *Vazquez*, 986 F.3d at 1126; *see Lawson*, 665 F. Supp. 3d at 1120–21 (finding drivers were "necessary" to the hiring entity because the entity "made more money if drivers made more deliveries").

CEVA suggests that *Vazquez*'s economic inquiry requires the factfinder to determine what percentage of CEVA's total profits come from Bellwether Plaintiffs' work.   (*See* Opp'n PMSJ 20 ("CEVA's success as a business neither depends on Plaintiff's business . . . nor [is it] CEVA's primary source of profits.").)   CEVA is mistaken.   In *Vazquez*, the Ninth Circuit discussed two similar Illinois cases with disparate results.   In one, chauffeurs "paid a percentage of their earnings to the company."   *Vazquez*, 986 F.3d at 1126 (citing *O'Hare*, 232 Ill. App. 3d at 112–13).   In the other, taxi drivers "paid a flat fee to lease taxicab medallions."   *Id.* (citing *Parks Cab Co. v. Annunzio*, 412 Ill. 549, 552–53 (1952)).   The Ninth Circuit explained that, in *O'Hare*, the chauffeurs were necessary to the success of the limousine company because the company "derived their profits from the earnings of the limousine chauffeurs."   *Id.* (citing *O'Hare*, 232 Ill. App. 3d at 112–13).   In other words, the limousine company's profits were directly affected by the performance, or lack thereof, of the chauffeurs.   By contrast, in *Parks Cab*, the taxi drivers were incidental to the success of a medallion company because "medallion companies' revenues were not affected by how much the taxicab drivers worked."   *Id.* (citing *Parks Cab*, 412 Ill. at 552–53).   In other words, the medallion company's profits were *not* affected by the taxi driver's performance because the taxi drivers had already paid a flat fee to the medallion companies.

Thus, *Vazquez* demonstrates that under an economic inquiry, the factfinder need find only that the hiring entity's profits are or would be affected by the putative employee's performance.   *See id.* ("Jan-Pro earns a percentage of the payments that

customers pay for cleaning services. Thus, unlike the medallion owners in *Parks Cab*, Jan-Pro is not indifferent to how much work unit franchisees do or how well they perform that work."). Here, as discussed above, the undisputed evidence compels the conclusion that Bellwether Plaintiffs' work, driving CEVA customer freight, clearly has at least some impact on CEVA's profits as a freight-forwarder.

The authorities CEVA cites do not compel a different result. (Opp'n PMSJ 20–21.) CEVA cites *Guynn-Neupane v. Magna Legal Services, LLC*, where the court found that jury focus groups were outside the usual course of business of a litigation services business. No. 19-cv-02652-VKD, 2021 WL 4481661, at *29 (N.D. Cal. Sept. 30, 2021). And for good reason: a litigation services business does not *need* to employ jury focus groups to perform its business. *Id.* CEVA also cites *Sportsman v. A Place for Rover, Inc.*, 537 F. Supp. 3d 1081, 1095 (N.D. Cal. 2021), analogizing itself to a pet care marketplace where pet care providers, who the court found were independent contractors, could advertise. (Opp'n PMS 21.) But in *Sportsman*, the pet care marketplace was a "true marketplace," where pet care providers could set their own prices and book their own services. 537 F. Supp. 3d at 1095. Here, however, CEVA sets the delivery prices, not the drivers, (DSGD 91), and also books pickup and deliveries, (DSGD 55).

Therefore, the Court finds that the first factor weighs decisively for Bellwether Plaintiffs, even when viewing the evidence in the light most favorable to CEVA.

### b. Continuous performance

The second *Vazquez* factor asks whether the hiring entity's "business model relies on [the putative employees] continuously performing" their work. *Vazquez*, 986 F.3d at 1126–27. This factor "capture[s] the distinction between independent contractor arrangements designed to evade requirements placed on employers[,] and traditional contractors like electricians and plumbers[] who perform incidental services for otherwise unrelated businesses." *Id.* at 1126. The emphasis is on the hiring entity and its business model, rather than the work each individual plaintiff

actually performed for the hiring entity.  *See Lawson*, 665 F. Supp. 3d at 1121 (rejecting a hiring entity's argument that the plaintiffs "each worked sporadically").

There is only one fact that is material here, and it is undisputed: CEVA has needed drivers like Plaintiffs to move its customers' freight for at least nine years. (*See* DSGD 72 ("Cargomatic began supplying Drivers for CEVA transports in late 2016 or early 2017").)  This undisputed piece of evidence, even when viewed in the light most favorable to CEVA, compels only one result: CEVA continuously used and relied on Bellwether Plaintiffs' services.  Nine years is more than enough time to establish continuity of work.  It certainly is enough time to distinguish Bellwether Plaintiffs from "traditional contractors like electricians and plumbers." *Vazquez*, 986 F.3d at 1127.

CEVA resists this result by arguing that it relies on Cargomatic, not drivers. (Opp'n PMSJ 22.)  This is a distinction without a difference.  CEVA relies on the service that Bellwether Plaintiffs provide: driving freight.  If Cargomatic were removed from CEVA's shipper/broker/driver model, CEVA would still rely on drivers to move freight.  In contrast, if the drivers were removed from the model, CEVA's business would suffer as it would lose the ability to move freight overground.  CEVA also argues that Plaintiffs had "total freedom over what jobs they chose." (*Id.* (emphasis omitted).)  However, as noted above, this inquiry focuses on nature of the service Bellwether Plaintiffs provide.  Whatever freedom Bellwether Plaintiffs had to choose jobs is not relevant to whether CEVA continuously used the services they provided.

Therefore, the Court finds the second factor weighs decisively for Bellwether Plaintiffs, even when viewing the undisputed evidence in the light most favorable to CEVA.

        c.    <u>How the business describes itself</u>

The third *Vazquez* factor requires the Court, in "determining the usual course of a hiring entity's business," to "consider how the business describes itself." *Vazquez*,

986 F.3d at 1127.  Courts "have rejected attempts by hiring entities to categorize their business as merely enabling, facilitating, or coordinating services rather than providing those services."  *Lawson*, 665 F. Supp. 3d at 1121 (citing *Bowerman v. Field Asset Servs.*, 60 F. 4th 459, 477 (9th Cir. 2023)).

Here, the parties do not appear to dispute that CEVA is in the "freight transportation" business.  (*See* Opp'n PMSJ 23; Reply PMSJ 6.)  And CEVA seems to adopt CEVA Logistics's proclamations, such as how it "advertises itself as a provider capable of providing global supply chain management and end-to-end logistics solutions," which only support this characterization.  (DSUF 11; *see* DMSJ 28 (citing CEVA Logistics' proclamations in its SUF); DSUF 7–10; PSUF 5, 8–9.)

However, the parties disagree on how Bellwether Plaintiffs should be characterized.  CEVA argues that Plaintiffs are in the "truck driving business."  (Opp'n PMSJ 23.)  Even if Bellwether Plaintiffs could be characterized that way—and the Court takes no position on this issue—"truck driving" is nothing if not "freight transportation."   CEVA also appears to argue that CEVA and Bellwether Plaintiffs must "perform the same work" to satisfy this factor.  (*Id.*)  Not so.  If that were the case, then the Prong B inquiry would simply ask whether the hiring entity and the putative employee perform the same work.   Instead, the inquiry is whether the putative employee performs work *outside* the hiring entity's usual course of business.  Cal. Civ. Code. § 2775(b)(1)(B).  Thus, even assuming that Bellwether Plaintiffs are properly classified as being in the "truck driving business," the Court finds that such work is not "outside" the "usual course of business" of a "freight transportation service."  *See Portillo v. Nat'l Freight, Inc.*, 606 F. Supp. 3d 72, 90–91 (D.N.J. 2022) (finding that commercial truck drivers were part of a defendant's usual course of business even after accepting the characterization that defendant's course of business was "provid[ing] logistics services").

                    d.    Summary of Prong B

After examining all the *Vazquez* factors and drawing all inferences in CEVA's favor, the Court finds that Bellwether Plaintiffs operate squarely within CEVA's usual course of business—freight transportation business—for the purposes of Prong B. The undisputed evidence shows that, under both a common-sense inquiry and an economic inquiry, Bellwether Plaintiffs are necessary to CEVA's business.    The undisputed evidence also shows that CEVA has continuously used Bellwether Plaintiffs' services, namely, truck driving.    Taken together, this demonstrates that Bellwether Plaintiffs are fully within CEVA's usual course of business.    Accordingly, CEVA cannot satisfy Prong B of the ABC test, and Bellwether Plaintiffs are entitled to partial summary judgment on this issue.    And because the ABC test is written in the conjunctive, such that a "finding of any prong against the hiring entity directs a finding of an employer-employee relationship," *Vazquez*, 986 F.3d at 1125, the Court finds that CEVA cannot satisfy the ABC test.

## VI.    CONCLUSION

The Court finds that a triable issue remains regarding whether the ABC test applies.  It further finds that, if the ABC test applies, CEVA cannot satisfy Prong B of the test.  Therefore, the Court **GRANTS IN PART** Bellwether Plaintiffs' Motion for Partial Summary Judgment as to Prong B only and **DENIES** the remainder of Bellwether Plaintiffs' Motion.  (Dkt. No. 112.)  The Court further **DENIES** CEVA's Motion for Partial Summary Judgment in its entirety.  (Dkt. No. 116.)  Therefore, with regards to CEVA's second and third affirmative defenses, what remains for trial is the issue of whether the business-to-business exception applies and, if so, whether CEVA satisfies the *Borello* factors.  The parties shall not litigate the individual elements of the ABC test.

**IT IS SO ORDERED.**

December 3, 2025

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**